UNITED STATES COURT
MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN CARR, AS TRUSTEEE FOR THE
BANKRUPTCY ESTATE OF ELIEZER and BOBBI
JO VELLON

    *Plaintiffs*

  vs.

FIRST HORIZON HOME LOAN d/b/a MNC
MORTGAGE; FT MORTGAGE d/b/a MNC; GARY L.
SWEITZER; GARY L. SWEITZER ENTERPRISES,
INC.; BRIAN HOCH; LOU FIERRO; CYNTHIA
BAXTER (AKA "CYNTHIA WOLF"); TIMOTHY
HUDSON;  OLD REPUBLIC NATIONAL TITLE
INSURANCE CO; MICHAEL SEDOR; CHARLES
BROWN; PENN STATE ABSTRACT COMPANY;
MEAGHER AND ASSOCIATES REALTY
CONSULTANTS; THOMAS D. MEAGHER; MARY JO
KRYNOCK; JOHN and JANE DOES 1-50,
    *Defendants*

**1: CV 03 1114**

*FILED SCRANTON*
*PER JUN 02 2006*
*DEPUTY CLERK*

## **COMPLAINT**

1. Plaintiffs bring this action to recover damages caused by the defendants herein

resulting from plaintiffs being the unwitting victims of a real estate development

scheme perpetrated and/or abetted by the defendants herein as well as others

unknown in name to plaintiff at this time.

2. As set forth at greater length below, plaintiffs were innocent first-time home

buyers who were defrauded into purchasing houses in "Barwood Estates," a

residential development in Dover, Pennsylvania, at prices well in excess of the

actual value of the homes.

3.  Defendants Gary L. Sweitzer, Brian Hoch, Lou Fierro, and Michael Sedor have

    pleaded guilty to conspiracy to defraud the Federal Housing and Urban

    Development Authority ["HUD"] in connection with this scheme.

4.  All defendants played various but integral roles in this scheme and its facilitation

    and, accordingly, plaintiffs bring this suit to enable them to recover their

    economic and emotional damages which they have suffered as a result of

    defendants' wrongdoing.

## INDEX TO COMPLAINT

**Page**

Jurisdiction And Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Seller Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Closing Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Lender Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

GENERAL FACTUAL ALLEGATIONS - THE BARWOOD HOUSING SCHEME . . . . . . . . 9

    The Lending Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    The Inflated Appraisals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    The Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

PLAINTIFF ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Eliezer and Bobbi Jo Vellon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ALLEGATIONS RELATING TO RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

The Enterprise or Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Predicate Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Violations of 18 U.S.C. §§ 1341 and 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Role of the Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

FRAUDULENT CONCEALMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

COUNT I – RICO Claim under 18 U.S.C. § 1962 ( c) & (d), Plaintiffs vs. Sweitzer . . . . . . . . 29

COUNT II– RICO Claim Under 18 U.S.C. § 1962( c) & (d), Plaintiffs vs. GLSE . . . . . . . . . . 30

COUNT III– RICO Claim Under 18 U.S.C. § 1962( c) & (d), Plaintiffs vs. Brian Hoch . . . . . . 32

COUNT IV – RICO Claim Under 18 U.S.C. § 1962( c) & (d), Plaintiffs
    vs. Michael Sedor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

COUNT V – RICO Claim Under 18 U.S.C. § 1962( c) & (d), Plaintiffs
    vs. Lou Fierro, Cynthia Baxter (AKA "Cynthia Wolf"), Timothy Hudson and First
    Horizon /FT Mortgage d/b/a MNC Mortgage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

COUNT VI – RICO Claim Under 18 U.S.C. § 1962( c) & (d), Plaintiffs vs. Penn State and Old
    Republic National Title Insurance Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

COUNT VII – FRAUD, Plaintiffs v. Sweitzer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

COUNT VIII – FRAUD, Plaintiffs v. Brian Hoch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

COUNT IX – FRAUD, Plaintiffs v GLSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

COUNT X – FRAUD, Plaintiffs v.Sedor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

COUNT XI – FRAUD, Plaintiffs v. Fierro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

COUNT XII – FRAUD, Plaintiffs v. First Horizon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

COUNT XIII –CONSPIRACY – Plaintiffs v. GLSE, Sweitzer, Hoch, Fierro, Wolf, Hudson
    and First Horizon /FT Mortgage d/b/a MNC Mortgage, Penn State & Sedor . . . . . . . . 48

COUNT XIV – Violation of UTPCPL - Plaintiffs v. Sedor . . . . . . . . . . . . . . . . . . . . . . . . . 50

COUNT XV – Violation of UTPCPL - Plaintiffs v. Sweitzer . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

COUNT XVI – Violation of The UTPCPL, Plaintiffs v. Hoch . . . . . . . . . . . . . . . . . . . . . . . . . 54

COUNT XVII – Violation of The UTPCPL, Plaintiffs vs. GLSE . . . . . . . . . . . . . . . . . . . . . . . 56

COUNT XVIII – Violation of The UTPCPL, Plaintiffs v. Penn State . . . . . . . . . . . . . . . . . . . . 58

COUNT XIX - Violation of The UTPCPL, Plaintiffs v. Old Republic . . . . . . . . . . . . . . . . . . . 61

COUNT XX - Violation of The UTPCPL, Plaintiffs v. Fierro . . . . . . . . . . . . . . . . . . . . . . . . . 63

COUNT XXI - Violation of The UTPCPL, Plaintiffs v. Lender Defendant First
      Horizon  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

COUNT XXII - LEGAL MALPRACTICE/PROFESSIONAL NEGLIGENCE –
      Plaintiffs v. Sedor, Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

COUNT XXIII - BREACH OF FIDUCIARY DUTY, Plaintiffs v. Sedor,
      Penn State and Old Republic  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

COUNT XXIV- APPRAISAL NEGLIGENCE, Plaintiffs v. Meagher and Associates,
      Meagher, Krynock & Eppolito . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

COUNT XXV - NEGLIGENCE, Plaintiffs v. Lender Defendant First Horizon
      Home Loan d/b/a/ FT Mortgage d/b/a MNC Mortgage
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

COUNT XXVI - VICARIOUS LIABILITY/RESPONDEAT SUPERIOR,
      Plaintiffs v. First Horizon, Penn State, Old Republic, Meagher
      & Associates  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964

      (c) and U.S.C. § 1331, because the claims asserted herein arise, *inter alia*, under and

      pursuant to 18 U.S.C. § 1961, *et seq*.  This Court has supplemental jurisdiction over

      plaintiffs' Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)

        because a substantial part of the events giving rise to the claim occurred in this District,

        and the real property at issue in this action is located within this District.

## THE PARTIES

7.      The Vellons are purchasers of properties located in the Barwood Estates

        development located in Dover Township, York County, Pennsylvania.

8.      Steven Carr is the Trustee for the Bankruptcy Estate of the Vellons, and was appointed by

        the Bankruptcy Court on or about January 1, 2003.

## The Seller Defendants

9.      Defendant Gary L. Sweitzer Enterprises Incorporated ("GLSE") is a Pennsylvania

        corporation with a principal place of business at 1969 York Haven Road, Etters,

        Pennsylvania 17319.  At all times relevant hereto, GLSE was in the business of

        developing residential communities, building homes, and selling them to the public,

        including the residential subdivision owned by GLSE known as Barwood Estates,

        located in Dover Township, York County, Pennsylvania.

10.     Defendant Gary L. Sweitzer ("Sweitzer") is an adult individual residing at 717 East Main

        Street, Dallastown, Pennsyvlania 17313 or 1969 York Haven Road, Etters, Pennsylvania

        17319. At all times relevant hereto, Sweitzer was the owner and chief executive officer of

        Sweitzer Enterprises.

11.     Defendant Brian G. Hoch ("Hoch") is an adult individual residing at 3324 Glen Hollow

        Drive, Dover, Pennsylvania 17315 or 1969 York Haven Road, Etters, Pennsylvania

        17319. At all times relevant hereto, Hoch was employed by GLSE as a sales manager.

12.    Sweitzer, Hoch and GLSE are collectively referred to hereinafter as "Seller Defendants".

**The Closing Agents**

13.    Defendant Michael Sedor, Esquire ("Sedor") is an adult individual residing at 320 East Market Street, Harrisburg, Pennsylvania 17108 or 2080 Linglestown Road, Suite 202, Harrisburg, Pennsylvania 17110. At all times relevant hereto, Sedor was a licensed attorney in the Commonwealth of Pennsylvania who sometimes traded as Penn State Abstract Agency or, in the alternative, worked as an agent, servant, or employee of Penn State Abstract Agency and Old Republic Title Insurance Company, and served as a real estate closing agent, settlement agent, escrow agent and attorney with respect to the sale of properties at Barwood Estates.

14.    Defendant Charles Brown, was a licensed attorney in the Commonwealth of Pennsylvania who worked for Michael Sedor and/or Penn State Abstract Agency and served as a real estate closing agent, settlement agent, escrow agent and attorney with respect to the sale of properties at Barwood Estates.

15.    Defendant Penn State Abstract Agency ("Penn State") is a Pennsylvania entity or corporation that maintains a principal place of business at 2080 Linglestown Road, Suite 202, Harrisburg, Pennsylvania 17110. At all times relevant hereto, Penn State was engaged in the business of serving as the closing agent, the escrow agent, and/or the title agent, and was also acting at all times as the agent, with respect to the sale of properties at Barwood Estates, servant and/or employee of defendant Old Republic National Title Insurance Company. Defendant Penn State is being sued individually, and also as master, employer, or principal of Michael Sedor, Esquire, and/or as a servant, agent, and

employee of Old Republic National Title Insurance Company. At all relevant times,

defendant Penn State was acting within the course and scope of employment through

Michael Sedor, Esquire, or as agent, servant, or employee of Old Republic National Title

Insurance Company.

16. Defendant Old Republic National Title Insurance Company ("Old Republic") is a

Minnesota corporation that maintains a principal place of business at 400 Second

Avenue, South Minneapolis, Minnesota 55401. At all times relevant hereto, Old Republic

was engaged in the business of selling real estate title insurance to the public in, among

other places, York County, Pennsylvania, and other portions of the Middle District of

Pennsylvania. In addition, Old Republic required that plaintiffs use its agent, Michael

Sedor as the closing agent, title agent and escrow agent as a condition for providing title

insurance.

17. Old Republic was the employer, master or principal of the attorney and fiduciary, Michael

Sedor, Esquire and/or Penn State Abstract, and required or dictated that Sedor act as

closing, title and escrow agent for each of the plaintiffs' closings.

18. Michael Sedor, Esquire, Penn State Abstract Agency, and Old Republic National Title

Insurance Company are collectively referred to hereinafter as the "Closing Agents".

**The Lender Defendants**

19. Defendant First Horizon Home Loan Corporation ("First Horizon") is a corporation

organized under the laws of the state of Kansas and registered to do business in the

Commonwealth of Pennsylvania. First Horizon is a subsidiary of First Tennessee Bank.

First Horizon's principal place of business is 4000 Horizon Way, Irvine, Texas. First

Horizon is in the business of, among other things, providing home loans to homebuyers for the purchase of residential real estate and improvements. First Horizon has been known as F.T. Mortgage Companies, and also sometimes does business as MNC Mortgage.

20.   Defendant FT Mortgage, a corporate affiliate of First Horizon, is a business entity doing business in the Commonwealth of Pennsylvania. FT Mortgage principal place of business is 9515 Deerco Road, Suite 302, Timonium, MD 21093 and they are in the business of providing home loans to homebuyers for the purchase of residential real estate and improvements.

21.   Defendant Cynthia Baxter (AKA "Wolf") was, at all times material hereto, employed by Defendant First Horizon and/or FT Mortgage as an underwriter and processor of loans.

22.   Defendant Timothy Hudson was, at all times material hereto, a vice president of First Horizon d/b/a MNC Mortgage, who was in charge of the Timonium Maryland office in which Lou Fierro and Cynthia Baxter also worked.

23.   First Horizon Home Loan Corporation; MNC Mortgage; and FT Mortgage are collectively referred to as the "Lender Defendants".

24.   Defendant Lou Fierro ("Fierro") is an adult individual residing at 375 Dewdrop Road, York, Pennsylvania. At all times relevant hereto, Fierro was employed by First Horizon and/or FT Mortgage as a loan officer.

25.   While working for First Horizon, Fierro worked out of First Horizon's Timonium, Maryland office and originated loans for properties located at Barwood Estates.

26.   Defendant Thomas Meagher ("Meagher") is an adult individual residing in Pennsylvania

with a principal business address of 439 W. Market Street, York Township, Pennsylvania 17404. At all times relevant hereto, Meagher was engaged in the business of providing real estate appraisals, and traded under the name of, or alternatively, was acting as the agent, servant and/or employee of , Meagher and Associates Realty Consultants.

27. Defendant Meagher and Associates Realty Consultants"(Meagher and Associates") was at all relevant times a business registered and licensed under the Commonwealth of Pennsylvania to provide real estate appraisals, with a principal place of business at 439 W. Market Street, York Township, Pennsylvania 17404. At all times relevant hereto, Meagher and Associates acted as the master, principal, or employer of appraisers who conducted appraisals for homes located at the Barwood Estates development.

28. Defendant Mary Jo Krynock ("Krynock") is an adult individual residing in Pennsylvania with a principal business in Pennsylvania. At all times relevant hereto, Krynock was engaged in the business of providing real estate appraisals.

## GENERAL FACTUAL ALLEGATIONS
## THE BARWOOD HOUSING SCHEME

29. Beginning in or about 1997, Sweitzer, by himself or in conjunction with other defendants herein mentioned, conceived of a plan to deceive unwary consumers into purchasing residences at amounts well in excess of fair market value in a development that he, through defendant GLSE, was developing in Dover, Pennsylvania.

30. Another principal actor at GLSE was defendant Brian G. Hoch, who played an integral role in all GLSE activities as Sweitzer's assistant.

31. The development was called "Barwood Estates" and ultimately came to consist of over

200 residences.

32.    The scheme began with the Seller Defendants promoting Barwood Estates through advertisements that were disseminated in print or radio in the interstate area in and around Pennsylvania.  The core theme was that prospective home buyers at Barwood Estates would not need any funds for down payment or closing costs and that one hundred percent (100%) VA/FHA financing was available.

33.    One typical advertisement promoted seven (7) plan models at Barwood Estates ranging from $77,900.00 to $96,900.00, and it indicated: "prices include a lot a no additional cost!"; that 100% VA/FHA Financing [was] Available; that there were standard interior and exterior features and standard construction and development features.  The advertisement stated "Barwood Estates, lowest price, highest quality 'Bar None'".

34.    The advertisements were specifically designed to entice individuals who were unsophisticated and inexperienced in home-ownership to shop the Barwood Estates development further and then, once the individuals became interested, to ensnare them in the scheme.  These representations were intended to attract and coerce individuals who could not afford to save the required 3% down payment to obtain a HUD or FHA insured mortgage, or who had marginal credit histories.

35.    Once potential customers appeared at initial sales meetings, the Seller Defendants would advised the customers that the Seller Defendants would  "take care of everything", including obtaining financing for the purchase, and that the customers should follow the Seller Defendants' instructions through closing.  The Seller Defendants would stress that the customers could purchase homes with little or no money down.

36.    For most of the customers, not being experienced in home purchases, the single most important criteria was their monthly mortgage payment. To entice the customers to proceed with the transaction, the Seller Defendants would quote unrealistically low monthly payments.

37.    Once customers showed interest, the Seller Defendants' goal was to make the customers sign "Builders Agreements". The agreement stated that the customers were to buy a house that was being, or would be, built for the customers. Once the customers had signed such an agreement, even if, as was usually the case, financing had not been obtained, the customers were effectively trapped. The Builders Agreement typically contained punitive liquidated damages provisions and, in some instances, the "Seller Defendants" even had the customer sign "pre-purchase loan notes" as to the liquidated damages.

38.    To further alleviate any concern about their ability to pay for the home, the Seller Defendants described a local "Mortgage Payment Help Fund" ["MPHF"] by which local "generous and concerned people" were purportedly paying a portion of the mortgage payments for one or two years in order to assist first-time home buyers in becoming homeowners.

39.    No such MPHF ever existed, but the Seller Defendants represented its existence to various plaintiffs, and actually demanded some customers write essays to apply for MPHF assistance.

40.    The next step in the sale process by the Seller Defendants was to shepherd the plaintiffs to the Lender Defendants. Again, the Seller Defendants reassured the plaintiffs that these

Lender Defendants could be trusted and that their directions were to be followed because the Lender Defendants were working for the customers (the plaintiffs). Lender Defendants conspired with the Seller Defendants to effectuate the sales to the plaintiffs in order to obtain commissions and fees that the Lender Defendants otherwise would not have been able to obtain because the plaintiffs would never have qualified for loans.

41.    As averred above, the Lender Defendants included, *inter alia,* defendant Lou. Fierro, who was a lending agent and manager of defendant First Horizon Loan Corporation. Consistently, he informed customers, including the plaintiffs, that they were looking after the customers' interests and repeatedly assured the customers that the customers could afford the homes given their incomes and assets. Accordingly, each of these individuals also told the customers that they would take care of all necessary paperwork, and told the plaintiffs what numbers to put in various application and disclosure documents, including, on occasion, numbers that were, in actuality, inflated or fictitious.

42.    The plaintiffs were never informed of the preexisting relationships and affiliations between the Seller Defendants, the Lender Defendants' agents, the title agent, the closing agent, the attorney, the escrow agent, and/or the Brokers.

43.    The Lender Defendants, including Fierro, assured the plaintiffs that they could afford the homes.

44.    Plaintiffs justifiably relied on the Lender Defendants' approval of their loan application as proof that they were qualified and able to purchase the homes and make the required mortgage payments.

45.    Plaintiffs also justifiably relied on the Lender Defendants' approval of the mortgage, after

the Lender Defendants arranged for and received an appraisal of each plaintiff's home, as confirmation that the sales price was at or near fair market value.

46.  Besides establishing relationships of trust with the Plaintiffs, the defendants also filled out forms and disclosure statements that included false, misleading or fraudulent statements. Not only did such statements include inflated asset figures, but also, as described below, included false sources of funds and false appraisals that were provided to some plaintiffs, and were also used in the certification process to the federal agencies. Moreover, the Lender Defendants deviated from the lending institutions' underwriting guidelines, or took advantage of poorly written guidelines to permit the applications to be approved for financing, notwithstanding the fact that the plaintiffs could not afford the loans, as the lending institutions knew or should have known. The plaintiffs themselves were unaware of this because they were always reassured by the defendants that the monthly payment was affordable, and that the house had been appraised at its fair market value.

47.  A third person to whom the customers were sent, and who actively aided the scheme, was Defendant Michael Sedor, Esquire and his agent Charles Brown Esquire. Sedor agreed to act as attorney for the plaintiffs at the closing, and, at the same time, act as the escrow agent, the closing agent, the title agent, agent of the title insurance companies, defendants Penn State Abstract and Old Republic National Title Insurance, and as agent for the Seller.

48.  The Seller Defendants' modus operandi had two other core components. On the one hand, the selling prices of the houses were inflated through over-appraised values. On the

other hand, a number of schemes were utilized to create the illusion of assets that the plaintiffs did not have. These two devices worked hand in hand to permit the financing of the properties at the inflated values.

### The Lending Scheme

49. The creation of illusory assets for each plaintiff was essential because, as averred hereinabove, the plaintiffs did not have sufficient assets to meet the HUD or FHA credit-worthiness requirements. Nor were the customers' assets generally sufficient to meet the Lender Defendants' own underwriting guidelines.

50. Both HUD and the FHA have regulations requiring home buyers to meet certain equity requirements at the time of closing. For example, in an FHA-insured loan transaction, regulations require buyers to make an "earnest money" down-payment of at least three percent of the purchase price as the buyer's investment in the property. Similarly, the FHA permits a seller to pay certain closing costs on behalf of the buyers, but limits the amount the seller could pay to six (6%) percent of the purchase price. If the seller provides a credit or other assistance in excess of 6% FHA rules require that the sales price be reduced, dollar for dollar, by the amount of the excess. In addition, the FHA also allows qualified third parties to give buyers gifts of money for the down-payment, to pay off pre-existing debt and for closing costs, as long as the gift meets the FHA's conditions. Among these conditions is that the third party not be a "related party" to the transaction, that is, a person or entity with an interest in the sale of the property, such as the seller, his agents, the lender, the broker or the settlement company. Acceptable third-party gift donors include relatives, employers and qualified charities.

51.    FHA regulations prohibit repayment of any gift or describing as a "gift" any contribution that has to be repaid.

52.    The Seller Defendants, in cooperation and coordination with other defendants, devised various schemes to evade the FHA/HUD guidelines. The Seller Defendants would pay off debts and obligations of the customers (such as automobile loans or credit card debt) using a third-party purportedly separate from GLSE. Similarly, the Seller Defendants would advance funds to plaintiffs' relatives or acquaintances who, in turn, would provide the funds to the plaintiffs as "gifts". The Seller Defendants would also create false gift letters in which the plaintiffs were instructed to certify that the closing costs were being obtained from sources other than GLSE. At other times, the Seller Defendants would disguise advances of money to the buyers as gifts from various supposed charities.

53.    At other closings, the Seller Defendants and Sedor would create the illusion that gift checks had been issued to the plaintiff, apparently from an acceptable source, when, in fact, there was no donor. The Seller Defendants would pay funds directly to the escrow agent at the closing and, in some instances, may not have paid any such funds at all, even though the supposed funds were listed on the HUD-1 form [the "HUD-1"].

54.    Another way in which the illusion of "equity" was created was that the Seller Defendants agreed to accept a lower gross amount in cash from the plaintiff than what was reflected on the HUD-1, by having the plaintiff state that the plaintiff had performed work on the home ("sweat equity"), such as building a deck, painting, and/or landscaping, and was thereby entitled to credit on the HUD-1 when, in fact, no work was performed.

55.    To perpetuate the scheme, the Seller Defendants used money orders, cashier's checks,

certified checks, official checks or third-party checks, which did not show the true source of the funds. At times, the Seller Defendants also used the bank accounts of their employees to conceal the true source of the money advanced to prospective buyers.

56.    The Seller Defendants not only defrauded the customers, but also defrauded the two federal agencies, HUD and FHA, who insured the mortgages, by blatantly creating the illusion of equity in plaintiffs' homes and misrepresenting plaintiffs' assets on loan applications.

57.    The Lender Defendants, through agents or employees, and Defendants Baxter and Hudson, failed to follow their usual and customary underwriting guidelines and due diligence procedures by, among other things, not determining if plaintiffs would be able to make their monthly mortgage payments.

58.    The Lender Defendants, and Defendants Baxter and Hudson prior to and subsequent to closing, failed to follow their own policies and procedures by not confirming the source of plaintiffs' earnest money deposit, failing to verify that the purchasers actually performed the work that resulted in the represented "sweat equity," failed to confirm that gift checks were actually disbursed as part of closing, or failed to confirm the alleged source of the gift check.

59.    Defendant Baxter conducted the processing and underwriting on the First Horizon loans. In doing so, she knowingly and deliberately permitted the loan to go through to approval, with full knowledge that the seller was providing funds for the plaintiffs' earnest money deposit, either through direct payments to the plaintiff, or by funding a bogus "gift" transaction, or by creating a phony credit for "sweat equity". Without her actions, the

loans for plaintiffs never would have been approved.

60.    Defendant Hudson, in his capacity as an officer of First Horizon/FT Mortgage, routinely approved every loan that came to him from the Barwood Estates development. He granted this approval, with full knowledge that the seller was providing funds for the plaintiffs' earnest money deposit, either through direct payments to the plaintiff, or by funding a bogus "gift" transaction, or by creating a phony credit for "sweat equity". Without his actions, the loans for these plaintiffs never would have been approved.

61.    The Lender Defendants offered mortgage loans to these consumer plaintiffs that were obviously beyond plaintiffs' ability to repay. No legitimate business justification existed for such loans, other than defendants' desire to make inflated profits, earnings, commissions or fees associated with the loan.

62.    By virtue of the fraudulently obtained HUD and FHA guarantee, the risk of loss to the Lender Defendants was minimized, because HUD and FHA guaranteed repayment of the loans to the Lender Defendants.

63.    In addition, the Lender Defendants had in place commission structures that encouraged their agents to make loans, even when they knew the money could not, or probably will not, be repaid in full.

### The Inflated Appraisals

64.    As part of the Barwood scheme, inflated appraisals not only ensured greater profits for the Seller Defendants, but also made mortgage loans easier to obtain, and facilitated FHA and HUD guarantees on the loans. The inflated appraisals also made it easier to preclude homeowner insurance.

65.     The Appraiser Defendants acted negligently, and in contravention of generally accepted appraisal standards in the community, in appraising homes at Barwood Estates.

66.     In appraising Barwood Estates properties, the Appraiser Defendants: included items that had not yet been built (such as a deck); described properties as completed when still under construction; and failed to obtain comparable values from outside the Barwood Estates project (which led to ever increasing inflated appraisals since already over-appraised values were used as base comparisons), and failed to note the significance of sales within the Barwood development of homes that were built by another builder, Rauhauser.  In short, whether through inadvertence or negligent acts, the Appraisal Defendants rendered appraisal opinions that materially overstated the value of the plaintiffs' properties.

67.     After the appraisal was obtained, it was provided to HUD/FHA.  As a result, a form entitled "HUD/VHA Addendum and Uniform Residential Loan Application, HUD/FHA Application for Insurance Under the National Housing Act" was issued to the borrowers indicating the lender's name and address, the loan amount, the interest rate, the proposed date of maturity, the amount of "up front" premium, the amount of annual premium, the term of annual premium, the lender's identification code, and finally, the statement of appraised value as determined by HUD/FHA with regard to the subject property.

68.     After receipt of the appropriate HUD/FHA forms, indicating or suggesting to the plaintiff-buyers that the proper appraisal and supporting documentation had been obtained, the closing was scheduled.

## The Closing

69.    At all times material hereto, Michael Sedor, Esquire, and Charles Brown, Esquire, acting individually or as agent, servant or employee of Penn State and Old Republic, by and through their actions, correspondence, letters, representations or omissions, indicated to plaintiffs that they had an affiliation, connection, or association with Penn State and Old Republic or that their work or actions were taken on behalf of Penn State and Old Republic, and  that these entities had sponsored, approved, or certified them as attorney, title agent, closing agent or escrow agent.

70.    Specifically, Sedor was listed as an authorized signatory, and his signature appeared as an authorized signatory, on the owners policy issued by Old Republic National Title Insurance alongside the signature of the president and secretary of Old Republic National Title Insurance Company.

71.    Old Republic's closing service letter to each Lender Defendant stated that Michael Sedor, Esquire, trading as Penn State Abstract Company was an agent or approved attorney with Old Republic, and required Sedor to be the closing and escrow agent.

72.    At closing, the plaintiffs entered into a mortgage and note with a Lender Defendant, to purchase the property for an amount far in excess of market value.

73.    In addition, plaintiffs paid inflated and additional settlement charges associated with the contracted home sales price, which was based on an inflated appraisal and well above fair market value.

74.    At settlement, seller credits were improperly listed as sweat equity, credit prepaids, and credit closing costs on the HUD-1.

75.   In addition, gift fund proceeds which were fraudulent or fictitious were routinely listed as the source of amounts paid by, or on behalf of, the borrower. Sedor was aware that the seller credits, gift funds and other items on the HUD-1 were false.

76.   In the alternative, Sedor failed to verify or reconcile the source of the funds listed on the HUD-1.

77.   On numerous occasions, Defendant Charles Brown attended the closing in lieu of Michael Sedor, and on his behalf, and signed Sedor's name to the closing documents in order to allow these transactions to close. Brown did so when he knew, or should have known, that the closing document statements which credited the buyer for gift funds, sweat equity and or down payments, were false.

## PLAINTIFF ALLEGATIONS[1]

### Eliezer and Bobbi Jo Vellon

78.   The Vellons purchased a house from defendant GLSE, Corp. on or about December 11, 2000 for $110,380.00 plus closing costs. The property was located at 3030 Milky Way Road, Dover, PA (hereinafter "the property").

79.   At the time of the purchase, the Vellons were unsophisticated home purchasers and first time homebuyers.

80.   The Vellons were enticed into buying the property by defendants Sweitzer, GLSE, Hoch, FT Mortgage Company d/b/a MNC Mortgage employee Lou Fierro ("Fierro"), Michael Sedor, Esquire, ("Sedor") and FT Mortgage Co. d/b/a MNC Mortgage ("FT Mortgage")

---

[1]For each and every individual Plaintiff allegation in paragraphs 78 through 103 in which defendant Michael Sedor is named, Plaintiffs hereby incorporate his agent/employee, Charles Brown, as an additional named defendant.

by their express or implied promises, or actions or omissions, which indicated to the

Vellons that they could have a new home with little or no money down. This was critical

to the Vellons as they had insufficient assets at the time of the property purchase to use

towards the down payment or closing costs.

81.    Defendants Sweitzer, Hoch or GLSE advertised the property located at Barwood Estates

as having "100 VA/FHA financing available." The Vellons learned about Barwood

Estates from these ads.

82.    A Builder's Agreement for Construction and Sale of Residential Dwelling was made

between defendant GLSE and the Vellons for the purchase of the property.

83.    The purchase price was listed as $110,380.00, with a "liquidated damages" clause

requiring the Vellons to pay $10,500.00 if they did not go through with the deal.

84.    Brian Hoch, Gary Sweitzer and Lou Fierro told the Vellons to provide a list of debts that

Sweitzer would pay off in order to improve their credit score and qualify them for a

mortgage. Although the Vellons provided the list, only a few of the debts were paid off.

85.    On information and belief, a direct endorsement of approval for a HUD/FHA insured

mortgage application for insurance under the National Housing Act was completed by

Fierro on behalf of the Vellons.

86.    Following a face to face interview with defendant FT Mortgage employee Fierro, a

uniform residential loan application was completed by Fierro. On this application, Fierro

listed as an asset a "gift" in the amount of $6,500.00, despite the fact that a gift was never

discussed during the application process. In addition, Fierro failed to list thousands of

dollars of debt on the application even though the Vellons disclosed these debts to Fierro.

87.  An appraisal of the property was conducted by defendants Mary Jo Krynock and Thomas Meagher of Meagher and Associates, who were selected by defendant FT Mortgage or by defendant Fierro on behalf of FT Mortgage.

88.  Defendant appraisers and defendant appraiser's company estimated the market value of the property at the time of the appraisal, and used comparable sales that came from the same street, in the same development, and built by the same developer as the home they were appraising.

89.  On information and belief, the property was appraised at approximately $112,000.00, an amount well in excess of the actual fair market value.

90.  At all times material hereto, the Vellons relied upon defendant appraiser and appraiser's company and the integrity of their appraisal process to provide a fair estimate of the market value of the property to ensure that the property was worth the purchase price.

91.  On December 11, 2000, the Vellons entered into a note and mortgage with defendant First Horizon/FT Mortgage for the sum of $110,250.00 plus interest.

92.  At all times material hereto, the Vellons relied upon defendants Fierro, First Horizon/FT Mortgage, Hoch, Sweitzer, GLSE and the integrity of their approval process to qualify them for a mortgage to ensure that they could afford the monthly mortgage payments.

93.  Defendant Sedor, represented both defendant GLSE and the Vellons in connection with the sale and the purchase of the property. Also, title insurance was provided by defendant Michael Sedor, Esquire through defendants Penn State and Old Republic. The authorized signatory for the policy was Michael Sedor, Esquire.

94.  Further, Old Republic directed that Michael Sedor be the closing agent. Sedor knowingly

falsified documents, including the HUD-1, to reflect that all deposit monies were coming from the Vellons to the seller.

95.    The seller funneled money to the Vellons, who in turn used the money to purchase the property. Specifically, Sweitzer provided a $6,000 money order to the Vellons' aunt, Edith Firestone, who deposited the money order and, subsequently, wrote a check out for the same amount to be used for closing costs.

96.    The defendants knew that the property was sold far in excess of the property's fair market value and also knew that the Vellons were not aware that the property was being sold to them far in excess of the property's fair market value.

97.    If the Vellons knew the fair market value of the property, they would not have gone forward with the December 11, 2000 purchase.

98.    The Vellons were presented with a large stack of documents at the closing and simply told to sign everything, without reading them.

99.    The Vellons relied on the approval process, Fierro and First Horizon/FT Mortgage to qualify them for the mortgage. They relied upon the appraisal of the property as was described to them by Fierro and First Horizon/FT Mortgage, and as indicated in the HUD forms, the fact that the transaction was memorialized on a HUD form indicated to the Vellons that the process was "legitimate".

100.    On information and belief, on December 11, 2000, specific loan closing instructions were given to defendant Sedor, by First Horizon/FT Mortgage. The instructions to the closing agent, Sedor, provided that the borrower in this FHA insured transaction must, from their own funds, make the required earnest money deposit, pay closing costs, and make the

required down payment required by FHA, unless otherwise explained.

101.    Sedor failed to comply with these specific loan instructions to the detriment of the

Vellons. These provisions were violated as the seller's contribution exceeded 6% of the

purchase price and the source of the funds contributed on behalf of the borrower, or

deposited with the lender, were not properly listed on the HUD-1 to show the source of

the funds.  Sedor had actual knowledge that the source of the funds was not the Vellons

as indicated on the HUD-1, but was, in fact, the seller's funds.

102.    After this transaction, and as a result of this transaction, the Vellons were unable to make

the mortgage payments and were forced to declare bankruptcy.

103.    As a result of the foregoing, the Vellons have been injured by (1) having paid an inflated

amount $110,380.00, for a house that was, at the time of purchase, worth substantially

less than that amount; (2) having paid, on a monthly basis an inflated amount in mortgage

payments for a house that was worth substantially less; (3) by having had damage to their

credit history by virtue of the stained circumstances in which they found themselves; (4)

by having overpaid to third parties extra fees and charges arising out of the over inflated

value of the house including, but not limited to, homeowners insurance, real estate taxes,

closing fees and real estate transfer taxes; (5) by suffering acute emotional distress and

anxiety.

## ALLEGATIONS RELATING TO RICO

104.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

105.    At all times material and relevant hereto, each of the defendants was and remains a

person within the meaning of 18 U.S.C. § 1962(a)(3).

## The Enterprise or Enterprises

106.   The following persons acted and conspired together to effectuate an enterprise as defined

under 18 U.S.C. § 1962, *et seq.*, or as existed as an association in fact which effectuated

an enterprise, which Plaintiffs refer to as the "Enterprise":

        a)   Gary L. Sweitzer

        b)   GLSE, Inc.

        c)   Brian Hoch

        d)   Lou Fierro

        e)   First Horizon/FT Mortgage d/b/a/ MNC Mortgage

        f)   Cynthia Baxter/Wolf

        g)   Timothy Hudson

        h)   Michael Sedor

107.   Alternatively, GLSE constitutes an Enterprise for which the allegations set forth herein

are equally applicable.

108.   The Enterprise engaged in activities which affect interstate commerce by  virtue of the

sale of homes in Pennsylvania through advertising and promotion that was disseminated

within and outside of Pennsylvania, and by sending materials to including, but not limited

to, mail and wire communications individuals both within and outside Pennsylvania,

provided false information to banks and federal agencies, such as HUD and FHA.

109.   While the defendants participated in the Enterprise and are, or were, a part of it, the

defendants also have or had existence separate and distinct from the Enterprise.

110.    Defendants maintained an interest in and control of the Enterprise and also conducted or

participated in the conduct of the Enterprise's affairs through a pattern of racketeering

activity.

111.    The Enterprise has an ascertainable structure separate apart from the pattern of

racketeering activity in which the defendants engaged.

### Predicate Acts

112.    With respect to the activities alleged herein, each defendant committed activities within

the meaning of 18 U.S.C. § 1962, *et seq*., by acting as part of the scheme, or by seeking to

aid and abet the scheme to violate 18 U.S.C. § 1962(a)( c) and (d), and/or by conspiring

to aid and abet the scheme.

113.    Plaintiffs are each persons within the meaning of 18 U.S.C. §1961(3).

114.    Each of the defendants also agreed to the operation of the scheme or artifice to deprive

plaintiffs and other consumers of property interests.

115.    In furtherance of these agreements, each of the defendants also agreed to interfere with,

obstruct, delay or affect commerce by attempting to obtain and/or actually obtaining

property interests to which defendants were not entitled.

116.    With respect to the overt acts and activities alleged herein, each defendant conspired with

each other and others not named as defendants in this Complaint, to violate 18 U.S.C. §

1962 (a) ( c) and (d).

117.    Each defendant also agreed and conspired with each other to participate, directly or

indirectly, within the fraudulent scheme or artifice alleged herein, and to wrongfully

retain monies obtained from or owed to plaintiffs.

118.    Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above, by aiding and abetting the commission of the foregoing acts, and/or by conspiring to commit the foregoing acts, in violation of the following provisions of Title 18 of the United States Code:

        a)    §371 and §1010, relating to conspiring to defraud or defrauding HUD;

        b)    § 1341, relating to mail fraud;

        c)    § 1343, relating to wire fraud;

        d)    § 1951(b)(2), relating to racketeering; and

        e)    § 1952, relating to travel in connection with racketeering.

119.    Defendants' aforementioned activities and/or conduct constituted a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

120.    The activities and conduct engaged in by defendants were both related to the *modus operandi* engaged in by said defendants of depriving plaintiffs of money, and was continuous inasmuch as the activities and/or conduct engaged by defendants exhibited a realistic, long-term threat of continued future injury to plaintiffs' interest in their business and/or property.

### Violations of 18 U.S.C. §§ 1341 and 1343

121.    For the purpose of executing and/or attempting to execute their scheme to defraud and to obtain by means of false pretenses, representations or promises, the defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service and received matter

and things therefrom, including, but not limited to agreements, correspondence, statements, faxes, and others.

### Role of the Defendants

122.    Defendants Sweitzer, GLSE, Hoch, Sedor, Baxter/Wolf, Hudson, First Horizon, FT Mortgage d/b/a MNC Bank, Fierro, Penn State Abstract had actual knowledge of, and knowing participation in, the conspiracy.

123.    Through the pattern of racketeering alleged above, these defendants received income which they in turn have used to acquire an interest in, establish and/or operate the Enterprise, particularly the receipt of funds from consumers and plaintiffs which, in turn, were used to operate the Enterprise as it continued to entrap other consumers, including the later-purchasing plaintiffs, for home purchases in the Barwood Estates area.

### FRAUDULENT CONCEALMENT

124.    The running of any statute of limitations has been tolled by reason of defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from plaintiffs that plaintiffs were purchasing homes at fraudulently-inflated prices.

125.    As a result of defendants' actions, plaintiffs were unaware, and could not have reasonably known or have learned through reasonable diligence, that they had been defrauded as the direct and proximate result of defendants' actions, until such time as the true value of their homes was discovered, either through an attempt to refinance, an attempt to sell, a foreclosure proceeding, or when the defendants' fraud was first exposed in local newspapers in 2003.

**COUNT I**
**RICO Claim under 18 U.S.C. § 1962 (c)&(d)**
**Plaintiffs vs. Sweitzer**

126.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding
paragraphs as if alleged in full herein.

127.    Sweitzer is a person within the meaning of 18 U.S.C. § 1961(3).

128.    Sweitzer is associated with an Enterprise comprised of GLSE or is within the association
of defendants in fact, previously mentioned.

129.    The Enterprise was engaged in or affected interstate commerce through its advertisements
which utilized the instrumentalities of the federal mail and wire services to advertise the
purchases of homes in Pennsylvania to consumers living in the interstate area.

130.    Sweitzer conducted the affairs of the Enterprise, in that he was the owner and controlling
shareholder of the company.  It is through the Enterprise that Sweitzer engaged in
activities that affected interstate commerce and through which Sweitzer unlawfully,
knowingly, and willfully did conduct and participate directly in the conduct of, or
conspired to facilitate the affairs of, the Enterprise through a pattern of racketeering
activity.

131.    The fraud alleged herein constitutes a pattern of racketeering activity within the meaning
of 18 U.S.C. § 1961(5), and Sweitzer acted with the intent to defraud plaintiffs.

132.    The pattern of racketeering activity engaged in by Sweitzer in controlling or conspiring to
facilitate the affairs of the Enterprise involved the ongoing solicitation of customers and

the consummation of home sales within York, Pennsylvania from in or about 1997 to 2002, as alleged herein.

133.    The pattern of racketeering activity engaged in Sweitzer in conducting or conspiring to facilitate the affairs of the Enterprise involved acts in support of the scheme, alleged herein, which acts constitute mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as well as the other predicate acts set forth herein.

134.    Sweitzer committed countless acts of mail fraud and wire fraud related to plaintiffs. The predicate acts include, but are not limited to, direct mailings, telephone calls, and radio transmissions, all made in furtherance of the scheme.

135.    Plaintiffs have been injured in their property by reason of Sweitzer's pattern of racketeering activity in that they purchased homes at fraudulently-inflated prices on which they have been obligated to make mortgage and other payments, including, but not limited to, property tax, home insurance, title insurance, private mortgage insurance, closing costs and fees (based on inflated, not the actual, value of the property), or have lost their homes due to foreclosure or bankruptcy proceedings or tax sales, or have sold them due to their inability to meet the substantially increased mortgage and escrow payments.

## COUNT II
## RICO Claim Under 18 U.S.C. § 1962( c) & (d)
## Plaintiffs vs. GLSE

136.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

137.    GLSE is a person within the meaning of 18 U.S.C. § 1961(3).

138.    GLSE is associated with an Enterprise comprised of the association of Defendants in fact, previously mentioned.

139.    The Enterprise was engaged in or affected interstate commerce through its advertisements which utilized the instrumentalities of the federal mail and wire services to advertise the purchases of houses in Pennsylvania to consumers living in the  area.

140.    GLSE was the Enterprise, or in the alternative, conducted the affairs of the Enterprise.  It is through the Enterprise that GLSE engaged in activities that affected interstate commerce and through which GLSE unlawfully, knowingly, and willfully did conduct and participate directly in the conduct of, or conspired to facilitate the affairs of the Enterprise through a pattern of racketeering activity.

141.    The fraud alleged herein constitutes a pattern of racketeering activity withing the meaning of 18 U.S.C. § 1961(5), and GLSE acted with the intent to defraud Plaintiffs.

142.    The pattern of racketeering activity engaged in by GLSE in controlling or conspiring to facilitate the affairs of the Enterprise involved the ongoing solicitation of customers and the consummation of home sales within York, Pennsylvania from in or about 1997 to 2002, as alleged herein.

143.    The pattern of racketeering activity engaged in GLSE, in conducting or conspiring to facilitate the affairs of the Enterprise, involved acts in support of the scheme alleged herein, which acts constitute mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as well as the other predicate acts set forth herein.

144.    GLSE committed countless acts of mail fraud and wire fraud related to plaintiffs.  The

predicate acts include, but are not limited to, mailings, telephone calls, and radio

transmissions, all made in furtherance of the scheme.

145.    Plaintiffs have been injured in their property by reason of GLSE's pattern of racketeering

activity in that they purchased homes at fraudulently-inflated prices on which they have

been obligated to make mortgage and other payments, including, but not limited to,

property tax, home insurance, title insurance, private mortgage insurance, closing costs

and fees (based on inflated, not the actual, value of the property), or have lost their homes

due to foreclosure or bankruptcy proceedings or tax sales, or have sold them due to their

inability to meet the substantially increased mortgage and escrow payments.

## COUNT III
## RICO Claim Under 18 U.S.C. § 1962( c) & (d)
## Plaintiffs vs. Brian Hoch

146.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

147.    Brian Hoch is a person within the meaning of 18 U.S.C. § 1961(3).

148.    Brian Hoch is associated with an Enterprise comprised of Gary Sweitzer Enterprises, Inc.

or within the association of defendants in fact, previously mentioned.

149.    The Enterprise was engaged in or affected interstate commerce through its advertisements

which utilized the instrumentalities of the federal mail and wire services to advertise the

purchases of houses in Pennsylvania to consumers living in the  area.

150.    Brian Hoch conducted the affairs of the Enterprise.  It is through the Enterprise that Brian

Hoch engaged in activities that affected interstate commerce and through which Brian

Hoch unlawfully, knowingly, and willfully did conduct and participate directly in or

conspired to facilitate the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

151.  The fraud alleged herein constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), and Brian Hoch acted with the intent to defraud plaintiffs.

152.  The pattern of racketeering activity engaged in by Brian Hoch in controlling or conspiring to facilitate the affairs of the Enterprise involved the ongoing solicitation of customers and the consummation of home sales within York, Pennsylvania from about 1997 to 2002, as alleged herein.

153.  The pattern of racketeering activity engaged in Brian Hoch in conducting or conspiring to facilitate the affairs of the Enterprise involved acts in support of the scheme alleged herein, which acts constitute mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as well as the other predicate acts set forth herein.

154.  Brian Hoch committed countless acts of mail fraud and wire fraud related to plaintiffs. The predicate acts include, but are not limited to, mailings, telephone calls, and radio transmissions all made in furtherance of the scheme.

155.  Plaintiffs have been injured in their property by reason of Brian Hoch's pattern of racketeering activity and predicate acts in that they purchased homes at fraudulently-inflated prices on which they have been obligated to make mortgage and other payments, including, but not limited to, property tax, home insurance, title insurance, private mortgage insurance, closing costs and fees (based on inflated, not the actual, value of the property), or have lost their homes due to foreclosure or bankruptcy proceedings or tax sales, or have sold them due to their inability to meet the substantially increased mortgage

and escrow payments.

## COUNT IV
## RICO Claim Under 18 U.S.C. § 1962( c) & (d)
## Plaintiffs vs. Michael Sedor

156.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

157.  Michael Sedor is a person within the meaning of 18 U.S.C. § 1961(3).

158.  Sedor associated with an Enterprise comprised of Gary Sweitzer Enterprises, Inc. or

within the association of defendants in fact, previously mentioned.

159.  The Enterprise was engaged in or affected interstate commerce through its

advertisements, which utilized the instrumentalities of the federal mail and wire services

to advertise the purchases of houses in Pennsylvania to consumers living in the  area.

160.  Sedor conducted the affairs of the Enterprise.  It is through the Enterprise that Sedor

engaged in activities that affected interstate commerce and through which Sedor

unlawfully, knowingly, and willfully did conduct and participate directly in the conduct

of, or conspired to facilitate the affairs of the Enterprise through a pattern of racketeering

activity.

161.  The fraud alleged herein constitutes a pattern of racketeering activity within the meaning

of 18 U.S.C. § 1961(5), and Sedor acted with the intent to defraud plaintiffs.

162.  The pattern of racketeering activity engaged in by Sedor in controlling or conspiring to

facilitate the affairs of the Enterprise involved the ongoing solicitation of customers and

the consummation of home sales within York, Pennsylvania from about 1997 to 2002, as

alleged herein.

163. The pattern of racketeering activity engaged by Sedor, in conducting or conspiring to facilitate the affairs of the Enterprise, involved acts in support of the scheme alleged herein, which acts constitute mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as well as the other predicate acts set forth herein.

164. Sedor committed countless acts of mail fraud and wire fraud related to plaintiffs. The predicate acts include, but are not limited to, mailings, telephone calls, misrepresentations on HUD or FHA documents, or radio transmissions all made in furtherance of the scheme.

165. Plaintiffs have been injured in their property by reason of Sedor's pattern of racketeering activity in that they purchased homes at fraudulently-inflated prices on which they have been obligated to make mortgage and other payments, including, but not limited to, property tax, home insurance, title insurance, private mortgage insurance, closing costs and fees (based on inflated, not the actual, value of the property), or have lost their homes due to foreclosure or bankruptcy proceedings or tax sales, or have sold them due to their inability to meet the substantially increased mortgage and escrow payments.

**COUNT V**
**RICO Claim Under 18 U.S.C. § 1962( c) & (d)**
**Plaintiffs vs. Lou Fierro, Cynthia Baxter (AKA "Cynthia Wolf"), Timothy Hudson and First Horizon /FT Mortgage d/b/a MNC Mortgage**

166. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

167. Fierro, Baxter, Hudson and First Horizon are persons within the meaning of 18 U.S.C. § 1961(3).

168.    Fierro, Baxter, Hudson and First Horizon are associated with an Enterprise comprised of Gary Sweitzer Enterprises, Inc. or within the association of defendants in fact, previously mentioned.

169.    The Enterprise was engaged in or affected interstate commerce through its advertisements which utilized the instrumentalities of the federal mail and wire services to advertise the purchases of homes in Pennsylvania to consumers living in the area.

170.    Fierro, Baxter, Hudson and First Horizon conducted the affairs of the Enterprise.  It is through the Enterprise that Fierro engaged in activities that affected interstate commerce and through which Fierro, Baxter, Hudson and First Horizon unlawfully, knowingly, and willfully did conduct and participate directly in the conduct of or conspired to facilitate the affairs of the Enterprise through a pattern of racketeering activity.

171.    The fraud alleged herein constitutes a pattern of racketeering activity withing the meaning of 18 U.S.C. § 1961(5), and Fierro, Baxter, Hudson and First Horizon acted with the intent to defraud plaintiffs.

172.    The pattern of racketeering activity engaged in by Fierro, Baxter, Hudson and First Horizon in controlling or conspiring to facilitate the affairs of the Enterprise, involved the ongoing solicitation of customers and the consummation of home sales within York, Pennsylvania from in or about 1997 to 2002, as alleged herein.

173.    The pattern of racketeering activity engaged by Fierro, Baxter, Hudson and First Horizon in conducting or conspiring to facilitate the affairs of the Enterprise, involved acts in support of the scheme alleged herein, which acts constitute mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as well as the other predicate acts set forth herein.

174.    Fierro, Baxter, Hudson and First Horizon committed numerous acts of mail fraud and wire fraud related to plaintiffs. The predicate acts include, but are not limited to, mailings, telephone calls, misrepresentations on HUD or FHA documents, or radio transmissions all made in furtherance of the scheme.

175.    Plaintiffs have been injured in their property by reason of the pattern of racketeering activity conducted by Fierro, Baxter, Hudson and First Horizon in that they purchased homes at fraudulently-inflated prices on which they have been obligated to make mortgage and other payments, including, but not limited to, property tax, home insurance, title insurance, private mortgage insurance, closing costs and fees (based on inflated, not the actual, value of the property), or have lost their homes due to foreclosure or bankruptcy proceedings or tax sales, or have sold them due to their inability to meet the substantially increased mortgage and escrow payments.

## COUNT VI
### RICO Claim Under 18 U.S.C. § 1962( c) & (d)
### Plaintiffs vs. Penn State and Old Republic National Title Insurance Company

176.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

177.    Penn State and Old Republic National Title Insurance Company each is a person within the meaning of 18 U.S.C. § 1961(3).

178.    Penn State and Old Republic National Title Insurance Company each is associated with an Enterprise comprised of Gary Sweitzer Enterprises, Inc. or within the association of defendants in fact, previously mentioned.

179.    The Enterprise was engaged in or affected interstate commerce through its advertisements

which utilized the instrumentalities of the federal mail and wire services to advertise the purchases of houses in Pennsylvania to consumers living in the interstate area.

180.    Penn State and Old Republic National Title Insurance Company each conducted the affairs of the Enterprise. It is through the Enterprise that Penn State and Old Republic National Title Insurance Company each engaged in activities that affected interstate commerce and through which Penn State and Old Republic National Title Insurance Company each unlawfully, knowingly, and willfully did conduct and participate directly in the conduct of, or conspiring to facilitate the affairs of the Enterprise through a pattern of racketeering activity.

181.    The fraud alleged herein constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), and Penn State and Old Republic National Title Insurance Company each acted with the intent to defraud plaintiffs.

182.    The pattern of racketeering activity engaged in by Penn State and Old Republic National Title Insurance Company in controlling or conspiring to facilitate the affairs of the Enterprise involved the ongoing solicitation of customers and the consummation of home sales within York, Pennsylvania from in or about 1997 to 2002, as alleged herein.

183.    The pattern of racketeering activity engaged in Penn State and Old Republic National Title Insurance Company in conducting or conspiring to facilitate the affairs of the Enterprise involved acts in support of the scheme alleged herein, which acts constitute mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as well as the other predicate acts set forth herein.

184.    Penn State and Old Republic National Title Insurance Company each committed

countless acts of mail fraud and wire fraud related to Plaintiffs. The predicate acts include, but are not limited to, mailings, telephone calls, misrepresentation to HUD or FHA, or radio transmissions all made in furtherance of the scheme.

185. Plaintiffs have been injured in their property by reason of Penn State and Old Republic National Title Insurance Company's pattern of racketeering activity and predicate in that they purchased homes at fraudulently-inflated prices on which they have been obligated to make mortgage and other payments, including, but not limited to, property tax, home insurance, title insurance, private mortgage insurance, closing costs and fees (based on inflated, not the actual, value of the property), or have lost their homes due to foreclosure or bankruptcy proceedings or tax sales, or have sold them due to their inability to meet the substantially increased mortgage and escrow payments.

## COUNT VII
## FRAUD
### Plaintiffs v. Sweitzer

186. All plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

187. Defendant Sweitzer, acting in his own right, and acting as agent, servant and\or employee of GLSE, made false representations to the plaintiffs.

188. The false representations included, but were not limited to, statements and documents indicating an artificially and fraudulently inflated price on the plaintiffs' homes, false representations made concerning true sources of payments by the Seller Defendants, and false representations made to federal agencies, all in connection with home sales and mortgages which plaintiffs could not afford.

189.  In some instances these false statements and documents involved the Seller Defendants paying off debt for plaintiffs, and thereafter claiming that the plaintiffs themselves paid off the debt in order to secure their mortgages.

190.  In other instances these false statements and documents involved making false gifts which were used by plaintiffs toward the down payment of their over-appraised homes.

191.  In other instances these false statements and documents involved having third parties claim that they made gifts which were used by plaintiffs toward the over-appraised home's down payment, when, in fact, the money was given by the Seller Defendants.

192.  Plaintiffs justifiably relied upon these false representations, which culminated in the sale of over-appraised homes to the plaintiffs, because they were unsophisticated first time home buyers with no prior experience in home purchases.

193.  As a direct and proximate result of defendant Sweitzer's fraud, plaintiffs have suffered economic losses and emotional harm.

**COUNT VIII**
**FRAUD**
**Plaintiffs v Brian Hoch**

194.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

195.  Defendant Hoch was acting as agent servant or employee of Sweitzer or GLSE.

196.  Defendant Hoch was acting in his own right, and acting as agent, servant and\or employee of GLSE or Sweitzer when he made false representations to the plaintiffs.

197.  The false representations included, but were not limited to statements and documents indicating an artificially and fraudulently inflated price on the plaintiffs' homes, false

representations made concerning true sources of payments by the Seller Defendants, and false representations made to federal agencies, all in connection with home sales and mortgages which plaintiffs could not afford.

198.    In some instances these false statements and documents involved the Seller Defendants paying off debt for plaintiffs, and thereafter claiming that the plaintiffs themselves paid off the debt in order to secure their mortgages.

199.    In other instances these false statements and documents involved making false gifts which were used by plaintiffs toward the down payment of their over appraised homes.

200.    In other instances these false statements and documents involved having third parties claim that they made gifts which were used by plaintiffs toward the over appraised home's down payment, when, in fact the money was given by the Seller Defendants.

201.    Plaintiffs justifiably relied upon these false representation, which culminated in the sale of an over appraised home to the plaintiffs, because they were unsophisticated first time home buyers with no prior experience in home purchases.

202.    As a direct and proximate result of defendant Hoch's fraud, plaintiffs have suffered economic losses and emotional harm.

## COUNT IX
## FRAUD
## Plaintiffs v. GLSE

203.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

204.    Defendant GLSE was acting through Hoch or Sweitzer, who were agents of the defendant, or through other agents, servants or employees of defendant GLSE.

205.    GLSE accepted the benefits of the actions of its own agents, servants, or employees, and was acting in its own right, when its own agents, servants or employees made false representations to the plaintiffs.

206.    The false representations included, but were not limited to statements and documents indicating an artificially and fraudulently inflated price on the plaintiffs' homes, false representations made concerning true sources of payments by the Seller Defendants, and false representations made to federal agencies, all in connection with home sales and mortgages which plaintiffs could not afford.

207.    In some instances these false statements and documents involved the Seller  Defendants paying off debt for plaintiffs, and thereafter claiming that the plaintiffs themselves paid off the debt in order to secure their mortgages.

208.    In other instances these false statements and documents involved making false gifts which were used by plaintiffs toward the down payment of their over appraised homes.

209.    In other instances these false statements and documents involved having third parties claim that they made gifts which were used by plaintiffs toward the over appraised home's down payment, when, in fact the money was given by the Seller Defendants.

210.    Plaintiffs justifiably relied upon these false representation, which culminated in the sale of over appraised homes to the plaintiffs, because they were unsophisticated first time home buyers with no prior experience in home purchases.

211.    As a direct and proximate result of defendant GLSE's fraud, plaintiffs have suffered economic losses and emotional harm.

## COUNT X
## FRAUD
### Plaintiffs v. Sedor

212.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding
paragraphs as if alleged in full herein.

213.  Defendant Sedor knew or should have known that the some of the closing documents
were false.

214.  Defendant Sedor, although having this knowledge, allowed for or was a willing
participant in a scheme to make false statements and documents, including false
statements on the HUD-1 which he prepared.

215.  Defendant Sedor knew that statements regarding funds which were recorded as being paid
on the HUD-1 which were false, misleading, or described non-existent funds.

216.  Defendant Sedor was acting with GLSE and with Hoch and/or Sweitzer, who were agents
of GLSE, or with other agents, servants or employees of GLSE.

217.  Defendant Sedor accepted the benefits of the fraudulent actions of Hoch, Sweitzer, and/or
GLSE, or other agents, servants, or employees of GLSE, and was acting in his own right,
when Sedor made his own false representations to the plaintiffs.

218.  The false representations included, but were not limited to, false statements on the HUD-
1, statements and documents indicating an artificially and fraudulently inflated price on
the plaintiffs' homes, false representations made concerning true sources of payments by
the seller defendants, and  false representations made to federal agencies, all in
connection with home sales and mortgages which plaintiffs could not afford.

219. In some instances these false statements and documents involved the Seller Defendants paying off debt for plaintiffs, and thereafter claiming that the plaintiffs themselves paid off the debt in order to secure their mortgages and listing otherwise on the HUD-1.

220. In other instances these false statements and documents involved making false gifts which were used by plaintiffs toward the down payment of their over appraised homes.

221. In other instances these false statements and documents involved having third parties claim that they made gifts which were used by plaintiffs toward the over appraised home's down payment, when, in fact the money was given by the Seller Defendants, and listing otherwise on the HUD-1.

222. Plaintiffs justifiably relied upon these false representation, which culminated in the sale of over appraised homes to the plaintiffs, because they were unsophisticated first time home buyers with no prior experience in home purchases.

223. As a direct and proximate result of defendant Sedor's fraud, plaintiffs have suffered economic losses and emotional harm.

### COUNT XI
### FRAUD
### Plaintiffs v. Fierro

224. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

225. Defendant Fierro was the supervisory loan officer for First Horizon Home Loan Corporation.

226. Defendant Fierro knew or should have known that as a result of his actions or representations, as set forth hereinbefore, plaintiffs placed their trust in him.

227.    To the extent Fierro was acting as a loan broker, Fierro represented that he would obtain the best possible mortgage terms and conditions for plaintiffs.

228.    Defendant Fierro knew or should have known that the appraised values of the plaintiffs' homes were inflated.

229.    Defendant Fierro also knew that many of the documents indicating the source of the down payment were either fraudulent or were not from the claimed source.

230.    Defendant Fierro also knew that the value of the homes were artificially inflated and that plaintiffs were not aware of this fact.

231.    Defendant Fierro knew or should have known that some of the closing documents were false.

232.    Defendant Fierro, although having this knowledge, allowed for or was a willing participant in a scheme to make false statements and produce false documents, including false statements on the HUD-1 and false statements made to FHA or HUD.

233.    Defendant Fierro knew that  statements regarding funds which were recorded as being paid on the HUD-1 were false, misleading, or described nonexistent funds.

234.    Defendant Fierro was acting with Hoch and/or Sweitzer and/or Sedor and/or GLSE, or the agents of these defendants, or through these or other agents, servants or employees of defendant GLSE, or Penn State or First Horizon.

235.    Defendant Fierro accepted the benefits of the fraudulent actions of Sedor, Hoch, Sweitzer, or these or other agents, servants, or employees of GLSE, or Penn State, or First Horizon.

236.    Defendant Fierro was acting for First Horizon when he made his own false representations to the plaintiffs, or when he failed to provide them with material

information respecting those representations.

237.  The false representations included, but were not limited to, statements and documents indicating artificially and fraudulently inflated prices on the plaintiffs' homes, false representations made concerning true sources of payments by the Seller Defendants, and false representations made to federal agencies, all in connection with home sales and mortgages which plaintiffs could not afford.

238.  In some instances, these false statements and documents involved the Seller Defendant paying off debt for plaintiffs, and thereafter claiming that the plaintiffs themselves paid off the debt in order to secure their mortgages.

239.  In other instances, these false statements and documents involved making false gifts which were used by plaintiffs toward the down payment of their over appraised homes.

240.  In other instances these false statements and documents involved having third parties claim that they made gifts which were used by plaintiffs toward the over appraised home's down payment, when, in fact the money was given by the Seller Defendants.

241.  Plaintiffs justifiably relied upon these false representation, which culminated in the sale of over appraised homes to the plaintiffs, because they were unsophisticated first time home buyers with no prior experience in home purchases.

242.  As a direct and proximate result of defendant Fierro's fraud, plaintiffs have suffered economic losses and emotional harm.

## COUNT XII
## FRAUD
## Plaintiffs v. First Horizon

243.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

244. Defendants Fierro, Hudson and Baxter had supervisory delegated authority to make commitments on behalf of First Horizon.

245. Because Fierro, Hudson and Baxter Wolf were supervisory agents of defendant First Horizon, First Horizon had imputed knowledge of the fraud scheme.

246. Further, based upon the totality of the circumstances, or based upon actual knowledge, defendant First Horizon knew or should have known that statements made by defendants and documents produced by were false, and were submitted and relied upon by both plaintiffs and federal agencies and authorities.

247. Defendant First Horizon was acting through Fierro or other agents, employees or servants, or through other agents, servants or employees of defendant GLSE, Aarrow Mortgage, or Penn State.

248. Defendant First Horizon accepted the benefits of the actions of its own agents, servants, or employees, or was acting in its own right, when its own agents, servants or employees made false representations to the plaintiffs.

249. The false representations included, but were not limited to statements and documents indicating an artificially and fraudulently inflated price on the plaintiffs' homes, false representations made concerning true sources of payments by the Seller Defendants, and false representations made to federal agencies, all in connection with home sales and mortgages which plaintiffs could not afford.

250. In some instances these false statements and documents involved the Seller Defendant paying off debt for plaintiffs, and thereafter claiming that the plaintiffs themselves paid

off the debt in order to secure their mortgages.

251.   In other instances these false statements and documents involved making false gifts

which were used by plaintiffs toward the down payment of their over appraised homes.

252.   In other instances these false statements and documents involved having third parties

claim that they made gifts which were used by plaintiffs toward the over appraised

home's down payment, when, in fact the money was given by the Seller Defendants.

253.   Plaintiffs justifiably relied upon these false representation, which culminated in the sale

of over appraised homes to the plaintiffs, because they were unsophisticated first time

home buyers with no prior experience in home purchases.

254.   As a direct and proximate result of defendant First Horizon's fraud, plaintiffs have

suffered economic losses and emotional harm.

## COUNT XIII
## CONSPIRACY
### Plaintiffs vs. GLSE, Sweitzer, Hoch, Fierro Wolf, Hudson, First Horizon /FT Mortgage d/b/a MNC Mortgage, Penn State & Sedor

255.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

256.   During the course of the promotion of homes in Barwood Estates to plaintiffs, these

defendants, with the intent to defraud, made material misrepresentations, including, but

not limited to:

a.     the value of the homes in Barwood Estates;

b.     the fair or actual appraised value of the homes in Barwood Estates;

c.     the ability of the plaintiffs to pay for, or afford to pay for such homes in Barwood

Estates;

d.    the actual or anticipated carrying costs for the homes purchased in Barwood

Estates; and

e.    the appropriateness, authenticity, legality, legitimacy and source of funds used by

plaintiffs, which were provided to them by or through the seller defendants.

257.   These representations were false or materially misleading in fact and known to be false by

these defendants at the time they were made.

258.   These representations were made with the intent to deceive or defraud the plaintiffs.

259.   These defendants knew that such representations were being made to plaintiffs, that they

were false or materially misleading and that the purpose of such representations were to

entice plaintiffs to purchase properties at overly inflated prices, or prices that these

plaintiffs could not afford.

260.   Each of these defendants offered services to plaintiffs, but conspired with each other not

to inform plaintiffs of the existence of the fraud in order to obtain fees for themselves

from plaintiffs or to earn inflated profits or bonuses, thereby aiding and abetting and

conspiring with each other in the fraud committed upon plaintiffs.

261.   As a direct and proximate result of the fraud, plaintiffs incurred substantial damages,

including compensatory damages, and resulting consequential damages in amounts

unknown, which shall be proven and which exceed any statutory or jurisdictional limit.

262.   As a direct and proximate result of these defendants malicious and intentional wrongful

acts and conduct, plaintiffs are also entitled to recover exemplary damages.

## COUNT XIV
## Violation of The UTPCPL
## Plaintiffs vs. Sedor

263.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

264.   The acts and practices of the defendant Sedor alleged herein were intended to result in the sale of homes to the consuming public, specifically the plaintiffs herein, at artificially and fraudulently inflated prices, pursuant to a scheme that involved, *inter alia*: a) inflated appraisals;  b)  false representations to plaintiffs and federal agencies and authorities as to the plaintiffs' financial status or the source of plaintiffs' monies used at their closings or the appraised value of the property; c) false representations to plaintiffs and to federal agencies as to the actual or fair market appraised value of the property; and d) false representations to plaintiffs as to the source of, or legality of the sources of funds used for their home purchases.

265.   Defendant Sedor's acts, misrepresentations, practices, or non-disclosures constituted unlawful, unfair, deceptive, and fraudulent business acts and practices, within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P. S. § 201-1, *et seq.* ("UTPCPL").

266.   Defendant Sedor either was a primary actor in the scheme alleged or aided and abetted the scheme.

267.   The actions and omissions by Sedor were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

268.   The actions and omissions by Sedor violated the provisions of the UTPCPL in at least
       one of the following ways:

   a.     created a likelihood of confusion or of misunderstanding as to the value of the
          house being purchased and financed by the consumer in violation of 73 P.S. §
          201-2(4)(xxi);

   b.     created a likelihood of confusion or of misunderstanding as to the source of the
          monies provided for the minimum borrower investment by representing that the
          monies were either being provided as gift funds by third-party entities, when they
          were not, or that the monies were coming from charitable organizations, when
          they were not, or that the money was credit for sweat equity, when it was not, or
          that the monies were part of some other reduction in cost or gift when in fact, they
          were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

   c.     created a likelihood of confusion or of misunderstanding in that he had a
          sponsorship, approval, status, affiliation, or connection with Penn State or Old
          Republic that he does not have, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S.
          §201-2(4)(v);

   d.     created a likelihood or confusion or misunderstanding as to the affiliation,
          connection or association with and among the various defendants, including Penn
          State or Old Republic in violation of 73 P.S. §201-2(4)(iii) and 73 P.S. §201-
          2(4)(xxi);

   e.     created a likelihood of confusion or of misunderstanding as to the source,
          sponsorship, approval or certification of HUD or the FHA concerning the

legitimacy, appropriateness, or appraised value of the home and the sales

transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

269.    Plaintiffs relied on the misrepresentations made by Sedor as evidenced by the

consummation of their purchase of their home at or near the overstated value.

270.    As a direct and proximate result of Sedor's violation of the UTPCPL, plaintiffs have

suffered ascertainable losses of money or property, and are entitled to damages in an

amount to be shown according to proof, as well as other relief set forth below.

**COUNT XV**
**Violation of The UTPCPL**
**Plaintiffs vs. Sweitzer**

271.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

272.    The acts and practices of the Sweitzer alleged herein were intended to result in the sale of

homes to the consuming public, specifically the plaintiffs herein, at artificially and

fraudulently inflated prices and pursuant to a scheme that involved, *inter alia*, inflated

appraisals,  false representations to plaintiff or federal agencies or authorities as to the

plaintiffs' financial status or the source of plaintiffs' monies used at their closings or  the

appraised value of the property, or false representations to plaintiffs as to the source of, or

legality of the sources of funds used for their home purchases, or as to the actual or fair

market appraised value of the property.

273.    Defendant Sweitzer's acts, misrepresentations, practices, and/or non-disclosures

constituted unlawful, unfair, deceptive, and fraudulent business acts and practices, within

the meaning of the UTPCPL.

274.   Defendant Sweitzer either was a primary actor in the scheme alleged or aided and abetted the scheme.

275.   The actions and omissions by Sweitzer were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

276.   The actions and omissions by Sweitzer violated the provisions of the UTPCPL in at least one of the following ways:

a.   created a likelihood of confusion or of misunderstanding as to the value of the house being purchased and financed by the consumer in violation of 73 P.S. § 201-2(4)(xxi);

b.   created a likelihood of confusion or of misunderstanding as to the source of the monies provided for the minimum borrower investment by representing that the monies were either being provided as gift funds by third-party entities, when they were not, or that the monies were coming from charitable organizations, when they were not, or that the money was credit for sweat equity, when it was not, or that the monies were part of some other reduction in cost or gift when in fact, they were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

c.   created a likelihood of confusion or of misunderstanding in that he had a sponsorship, approval, status, affiliation, or connection with GLSE or Penn State or another defendant that he does not have, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. §201-2(4)(v);

d.   created a likelihood or confusion or misunderstanding as to the affiliation, connection or association with and among the various defendants, including Penn

State or GLSE, in violation of 73 P.S. §201-2(4)(iii) and 73 P.S. §201-2(4)(xxi);

e.    created a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of HUD or the FHA concerning the legitimacy, appropriateness, or appraised value of the home and the sales transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

277.    Plaintiffs relied on the misrepresentations made by Sweitzer as evidenced by the consummation of their purchase of their home at or near the overstated value.

278.    As a direct and proximate result of Sweitzer's violation of the UTPCPL, plaintiffs have suffered ascertainable losses of money or property, and are entitled to damages in an amount to be shown according to proof, as well as other relief set forth below.

**COUNT XVI**
**Violation of The UTPCPL**
**Plaintiffs vs. Hoch**

279.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

280.    The acts and practices of the Hoch alleged herein were intended to result in the sale of homes to the consuming public, specifically the plaintiffs herein, at artificially and fraudulently inflated prices and pursuant to a scheme that involved, *inter alia*, inflated appraisals,  false representations to plaintiff or federal agencies or authorities as to the plaintiffs' financial status and/or the source of plaintiffs' monies used at their closings or the appraised value of the property, or false representations to plaintiffs as to the source of, or legality of the sources of funds used for their home purchases, or as to the actual or fair market appraised value of the property.

281. Defendant Hoch's acts, misrepresentations, practices, or non-disclosures constituted unlawful, unfair, deceptive, and fraudulent business acts and practices, within the meaning of the UTPCPL.

282. Defendant Hoch either was a primary actor in the scheme alleged or aided and abetted the scheme.

283. The actions and omissions by Hoch were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

284. The actions and omissions by Hoch violated the provisions of the UTPCPL in at least one of the following ways:

   a.    created a likelihood of confusion or of misunderstanding as to the value of the house being purchased and financed by the consumer in violation of 73 P.S. § 201-2(4)(xxi);

   b.    created a likelihood of confusion or of misunderstanding as to the source of the monies provided for the minimum borrower investment by representing that the monies were either being provided as gift funds by third-party entities, when they were not, or that the monies were coming from charitable organizations, when they were not, or that the money was credit for sweat equity, when it was not, or that the monies were part of some other reduction in cost or gift when in fact, they were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

   c.    created a likelihood of confusion or of misunderstanding in that he had a sponsorship, approval, status, affiliation, or connection with GLSE or Penn State or Sweitzer or another defendant that he does not have, in violation of 73 P.S. §

201-2(4)(xxi) and 73 P.S. §201-2(4)(v);

d.      created a likelihood or confusion or misunderstanding as to the affiliation,

connection or association with and among the various defendants, including Penn

State or GLSE or Sweitzer in violation of 73 P.S. §201-2(4)(iii) and 73 P.S. §201-

2(4)(xxi);

e.      created a likelihood of confusion or of misunderstanding as to the source,

sponsorship, approval or certification of HUD or the FHA concerning the

legitimacy, appropriateness, or appraised value of the home and the sales

transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

285.    Plaintiffs relied on the misrepresentations made by Hoch as evidenced by the

consummation of their purchase of their home at or near the overstated value.

286.    As a direct and proximate result of Hoch's violation of the UTPCPL, plaintiff have

suffered ascertainable losses of money or property, and are entitled to damages in an

amount to be shown according to proof, as well as other relief set forth below.

### COUNT XVII
### Violation of The UTPCPL
### Plaintiffs vs. GLSE

287.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

288.    The acts and practices of the defendant GLSE alleged herein were intended to result in

the sale of homes to the consuming public, specifically the plaintiffs herein, at artificially

and fraudulently inflated prices, pursuant to a scheme that involved, *inter alia*: a) inflated

appraisals;  b)  false representations to plaintiffs and federal agencies and authorities as to

the plaintiffs' financial status or the source of plaintiffs' monies used at their closings or the appraised value of the property; c) false representations to plaintiffs and to federal agencies as to the actual or fair market appraised value of the property; and d) false representations to plaintiffs as to the source of, or legality of the sources of funds used for their home purchases.

289.    Defendant GLSE's acts, misrepresentations, practices, or non-disclosures constituted unlawful, unfair, deceptive, and fraudulent business acts and practices, within the meaning of the UTPCPL.

290.    Defendant GLSE either was a primary actor in the scheme alleged or aided and abetted the scheme.

291.    The actions and omissions by GLSE were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

292.    The actions and omissions by GLSE violated the provisions of the UTPCPL in at least one of the following ways:

a.      created a likelihood of confusion or of misunderstanding as to the value of the house being purchased and financed by the consumer in violation of 73 P.S. § 201-2(4)(xxi);

b.      created a likelihood of confusion or of misunderstanding as to the source of the monies provided for the minimum borrower investment by representing that the monies were either being provided as gift funds by third-party entities, when they were not, or that the monies were coming from charitable organizations, when they were not, or that the money was credit for sweat equity, when it was not, or

that the monies were part of some other reduction in cost or gift when in fact, they

were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

c.    created a likelihood of confusion or of misunderstanding in that they had a

sponsorship, approval, status, affiliation, or connection with Sedor, Sweitzer,

Hoch, or Penn State or another defendant lender that they do not have, in violation

of 73 P.S. § 201-2(4)(xxi) and 73 P.S. §201-2(4)(v);

d.    created a likelihood or confusion or misunderstanding as to the affiliation,

connection or association with and among the various defendants, including Penn

State or a lender defendant in violation of 73 P.S. §201-2(4)(iii) and 73 P.S. §201-

2(4)(xxi);

e.    created a likelihood of confusion or of misunderstanding as to the source,

sponsorship, approval or certification of HUD or the FHA concerning the

legitimacy, appropriateness, or appraised value of the home and the sales

transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

293.    Plaintiffs relied on the misrepresentations made by GLSE as evidenced by the

consummation of their purchase of their home at or near the overstated value.

294.    As a direct and proximate result of GLSE's violation of the UTPCPL, plaintiffs have

suffered ascertainable losses of money or property, and are entitled to damages in an

amount to be shown according to proof, as well as other relief set forth below.

## COUNT XVIII
## Violation of The UTPCPL
## Plaintiffs vs. Penn State

295. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

296. The acts and practices of the defendant Penn State alleged herein were intended to result in the sale of homes to the consuming public, specifically the plaintiffs herein, at artificially and fraudulently inflated prices, pursuant to a scheme that involved, *inter alia*: a) inflated appraisals;  b)  false representations to plaintiffs and federal agencies and authorities as to the plaintiffs' financial status or the source of plaintiffs' monies used at their closings or the appraised value of the property; c) false representations to plaintiffs and to federal agencies as to the actual or fair market appraised value of the property; and d) false representations to plaintiffs as to the source of, or legality of the sources of funds used for their home purchases.

297. Defendant Penn State's acts, misrepresentations, practices, or non-disclosures constituted unlawful, unfair, deceptive, and fraudulent business acts and practices, within the meaning of the UTPCPL.

298. Defendant Penn State either was a primary actor in the scheme alleged or aided and abetted the scheme.

299. The actions and omissions by Penn State were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

300. The actions and omissions by Penn State violated the provisions of the UTPCPL in at least one of the following ways:

a. created a likelihood of confusion or of misunderstanding as to the value of the house being purchased and financed by the consumer in violation of 73 P.S. § 201-2(4)(xxi);

b. created a likelihood of confusion or of misunderstanding as to the source of the monies provided for the minimum borrower investment by representing that the monies were either being provided as gift funds by third-party entities, when they were not, or that the monies were coming from charitable organizations, when they were not, or that the money was credit for sweat equity, when it was not, or that the monies were part of some other reduction in cost or gift when in fact, they were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

c. created a likelihood of confusion or of misunderstanding in that they had a sponsorship, approval, status, affiliation, or connection with GLSE or Old Republic or Sedor, or another defendant lender that they do not have, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. §201-2(4)(v);

d. created a likelihood or confusion or misunderstanding as to the affiliation, connection or association with and among the various defendants, including Old Republic or Sedor or GLSE , or another lender defendant in violation of 73 P.S. §201-2(4)(iii) and 73 P.S. §201-2(4)(xxi);

e. created a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of HUD or the FHA concerning the legitimacy, appropriateness, or appraised value of the home and the sales transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

301. Plaintiffs relied on the misrepresentations made by Sweitzer as evidenced by the consummation of their purchase of their home at or near the overstated value.

302. As a direct and proximate result of Sweitzer's violation of the UTPCPL, plaintiffs have suffered ascertainable losses of money or property, and are entitled to damages in an amount to be shown according to proof, as well as other relief set forth below.

### COUNT XIX
### Violation of The UTPCPL
### Plaintiffs vs. Old Republic

303. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

304. The acts and practices of the defendant Old Republic alleged herein were intended to result in the sale of homes to the consuming public, specifically the plaintiffs herein, at artificially and fraudulently inflated prices, pursuant to a scheme that involved, *inter alia*: a) inflated appraisals; b) false representations to plaintiffs and federal agencies and authorities as to the plaintiffs' financial status or the source of plaintiffs' monies used at their closings or the appraised value of the property; c) false representations to plaintiffs and to federal agencies as to the actual or fair market appraised value of the property; and d) false representations to plaintiffs as to the source of, or legality of the sources of funds used for their home purchases.

305. Defendant Old Republic's acts, misrepresentations, practices, or non-disclosures constituted unlawful, unfair, deceptive, or fraudulent business acts and practices, within the meaning of the UTPCPL.

306. Defendant Old Republic either was a primary actor in the scheme alleged or aided and

abetted the scheme.

307.    The actions and omissions by Old Republic were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

308.    The actions and omissions by Old Republic violated the provisions of the UTPCPL in at least one of the following ways:

a.      created a likelihood of confusion or of misunderstanding as to the legality, authenticity or legitimacy of the funds used, and the manner and reporting of the funds used for the purchase of the homes, by the consumer in violation of 73 P.S. § 201-2(4)(xxi);

b.      created a likelihood of confusion or of misunderstanding as to the source of the monies provided for the minimum borrower investment by representing that the monies were either being provided as gift funds by third-party entities, when they were not, or that the monies were coming from charitable organizations, when they were not, or that the money was credit for sweat equity, when it was not, or that the monies were part of some other reduction in cost or gift when in fact, they were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

c.      created a likelihood of confusion or of misunderstanding in that he had a sponsorship, approval, status, affiliation, or connection with GLSE or Penn State Abstract or Sedor, or another defendant that he does not have, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. §201-2(4)(v);

d.      created a likelihood of confusion or misunderstanding as to the affiliation, connection or association with and among the various defendants, including Penn

State or Sedor in violation of 73 P.S. §201-2(4)(iii) and 73 P.S. §201-2(4)(xxi);

e.      created a likelihood of confusion or misunderstanding as to the source,

sponsorship, approval or certification of HUD or the FHA concerning the

legitimacy, appropriateness, or appraised value of the home and the sales

transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

309.    Plaintiffs relied on the misrepresentations made by Old Republic as evidenced by the

consummation of their purchase of their home at or near the overstated value.

310.    As a direct and proximate result of Old Republic's violation of the UTPCPL, plaintiffs

have suffered ascertainable losses of money or property, and are entitled to damages in an

amount to be shown according to proof, as well as other relief set forth below.

## COUNT XX
## Violation of The UTPCPL
## Plaintiffs vs. Fierro

311.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

312.    The acts and practices of the defendant Fierro alleged herein were intended to result in the

sale of homes to the consuming public, specifically the plaintiffs herein, at artificially and

fraudulently inflated prices, pursuant to a scheme that involved, *inter alia*: a) inflated

appraisals;  b)  false representations to plaintiffs and federal agencies and authorities as to

the plaintiffs' financial status or the source of plaintiffs' monies used at their closings or

the appraised value of the property; c) false representations to plaintiffs and to federal

agencies as to the actual or fair market appraised value of the property; and d) false

representations to plaintiffs as to the source of, or legality of the sources of funds used for

their home purchases.

313.  Defendant Fierro's acts, misrepresentations, practices, or non-disclosures constituted

unlawful, unfair, deceptive, and fraudulent business acts and practices, within the

meaning of the UTPCPL.

314.  Defendant Fierro either was a primary actor in the scheme alleged or aided and abetted

the scheme.

315.  Defendant Fierro had a fiduciary relationship to the plaintiffs.

316.  The actions and omissions by Fierro were committed in the conduct of trade or commerce

as defined by 73 P.S. § 201-2(3).

317.  The actions and omissions by Fierro violated the provisions of the UTPCPL in at least

one of the following ways:

a.  created a likelihood of confusion or misunderstanding as to the value of the house

being purchased and financed by the consumer in violation of 73 P.S. § 201-

2(4)(xxi);

b.  created a likelihood of confusion or misunderstanding as to the source of the

monies provided for the minimum borrower investment by representing that the

monies were either being provided as gift funds by third-party entities, when they

were not, or that the monies were coming from charitable organizations, when

they were not, or that the money was credit for sweat equity, when it was not, or

that the monies were part of some other reduction in cost or gift when in fact, they

were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

c.  created a likelihood of confusion or of misunderstanding in that he had a

sponsorship, approval, status, affiliation, or connection with Aarrow, First

Horizon, GLSE or Penn State or another defendant that he does not have, in

violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. §201-2(4)(v);

d.    created a likelihood of confusion or misunderstanding as to the affiliation,

connection or association with and among the various defendants, including Penn

State, or First Horizon, or Aarrow, or GLSE in violation of 73 P.S. §201-2(4)(iii)

and 73 P.S. §201-2(4)(xxi);

e.    created a likelihood of confusion or misunderstanding as to the source,

sponsorship, approval or certification of HUD or the FHA concerning the

legitimacy, appropriateness, or appraised value of the home and the sales

transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

318.    Plaintiffs relied on the misrepresentations made by Fierro as evidenced by the

consummation of their purchase of their home at or near the overstated value.

319.    As a direct and proximate result of Fierro's violation of the UTPCPL, plaintiffs have

suffered ascertainable losses of money or property, and are entitled to damages in an

amount to be shown according to proof, as well as other relief set forth below.

## COUNT XXI
### Violation of The UTPCPL
### Plaintiffs vs. Lender Defendant
### First Horizon Home Loan d/b/a MNC Mortgage

320.    Plaintiffs, incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

321.    These Lender Defendants each committed at least one or more of the following acts or

omissions:

a.    providing plaintiffs with "good faith estimates" of their monthly mortgage payment which these Lender Defendants knew or should have known was always lower than actual monthly mortgage payment after settlement;

b.    failing to follow their own underwriting process or failing to follow their own usual and customary underwriting guidelines and due diligence procedures, following instead a separate and distinct set of underwriting guidelines and due diligence procedures followed only for Barwood Estates buyers or buyers of GLSE homes;

c.    failing to follow their customary underwriting guidelines to determine if the plaintiffs would be able to make their monthly mortgage payments;

d.    failing to use independent appraisals, but instead merely relying on appraisals performed by the Appraisal Defendants who were selected or chosen by the Seller Defendants, in violation of industry standards and practices;

e.    failing to use independent appraisals, although they knew or should have known that the appraisals provided by the Appraisal Defendants and utilized by them overstated the actual value of the homes securing the indebtedness;

f.    failing to verify that the Barwood Estate purchasers' earnest monies were used as the source of their down payment toward their Barwood Estates home;

g.    ignoring indications that these plaintiffs were unable to save or obtain for themselves their required FHA or HUD earnest money deposits, or ignoring facts that the source of their deposits was from an impermissible, illegal, or illegitimate

contribution from the Seller Defendants;

h.    failing to follow their own credit policies, including their self proclaimed

responsibilities and guidelines; and

i.    otherwise modifying or altering their normal actions, practices or procedures.

322.    These Lender Defendants created an environment for their designated agents, servants or

employees to perform fraudulent, deceptive or illegal acts while working for these Lender

Defendants.

323.    By providing financing for the sales of these Barwood Estates homes, these Lender

Defendants secured an inflated return on their investment that allowed them to earn

greater profits.

324.    Once the transaction was completed and the loan closed, as a result of these Lender

Defendants' acts, these plaintiffs had purchased a home for a price materially and

substantially in excess of its actual fair market value, and were obligated to pay a note

and mortgage that they would likely not be able to afford, or would have extreme

difficulty meeting.

325.    The acts and practices of the Lender Defendants  alleged herein were intended to result in

the sale of homes to the consuming public, specifically the plaintiffs herein, at artificially

and fraudulently inflated prices, pursuant to a scheme that involved, *inter alia*: a) inflated

appraisals;  b)  false representations to plaintiffs and federal agencies and authorities as to

the plaintiffs' financial status or the source of plaintiffs' monies used at their closings or

the appraised value of the property; c) false representations to plaintiffs and to federal

agencies as to the actual or fair market appraised value of the property; and d) false

representations to plaintiffs as to the source of, or legality of the sources of funds used for their home purchases.

326.    The Lender Defendants' acts, misrepresentations, practices, or non-disclosures constituted unlawful, unfair, deceptive, and fraudulent business acts and practices, within the meaning of the UTPCPL.

327.    The Lender Defendants either were primary actors in the scheme alleged or aided and abetted the scheme.

328.    The actions and omissions by the Lender Defendants were committed in the conduct of trade or commerce as defined by 73 P.S. § 201-2(3).

329.    The actions and omissions by the Lender Defendants violated the provisions of the UTPCPL in at least one of the following ways:

a.    created a likelihood of confusion or misunderstanding as to the value of the house being purchased and financed by the consumer in violation of 73 P.S. § 201-2(4)(xxi);

b.    created a likelihood of confusion or misunderstanding as to the source of the monies provided for the minimum borrower investment by representing that the monies were either being provided as gift funds by third-party entities, when they were not, or that the monies were coming from charitable organizations, when they were not, or that the money was credit for sweat equity, when it was not, or that the monies were part of some other reduction in cost or gift when in fact, they were not, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. § 201-2(4)(v);

c.    created a likelihood of confusion or misunderstanding in that they had a

sponsorship, approval, status, affiliation, or connection with another defendant

that they do not have, in violation of 73 P.S. § 201-2(4)(xxi) and 73 P.S. §201-

2(4)(v);

d.     created a likelihood or confusion or misunderstanding as to the affiliation,

connection or association with and among the various defendants, in violation of

73 P.S. §201-2(4)(iii) and 73 P.S. §201-2(4)(xxi);

e.     created a likelihood of confusion or misunderstanding as to the source,

sponsorship, approval or certification of HUD or the FHA concerning the

legitimacy, appropriateness, or appraised value of the home and the sales

transaction, in violation of 73 P.S. § 201-2(4)(ii) and 73 P.S. §201-2(4)(xxi).

f.     created a likelihood of confusion or misunderstanding as to these plaintiffs' ability

to afford their mortgage payments or the actual costs associated with the

plaintiffs' mortgage payment, in violation of 73 P.S. §201-2(4)(xxi).

330.   Plaintiffs relied on the misrepresentations made by the Lender Defendants as evidenced

by the consummation of their purchase of their home at or near the overstated value.

331.   As a direct and proximate result of the Lender Defendants' violation of the UTPCPL,

plaintiffs have suffered ascertainable losses of money or property, and are entitled to

damages in an amount to be shown according to proof, as well as other relief set forth

below.

## COUNT XXII
## LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE
### Plaintiffs vs. Sedor and Brown

332.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

333.  At all times material hereto, as set forth hereinbefore, defendants Sedor and Brown were licensed attorneys in the Commonwealth of Pennsylvania.

334.  As set forth hereinbefore, all plaintiffs retained defendant Sedor to act as their attorney at the "closing"of their home purchases. On many of these occasions, Sedor then retained Brown to act as plaintiffs' attorney in his place.

335.  Defendants Sedor and Brown owed a duty of professional responsibility to each of those plaintiffs as plaintiffs' closing agent.

336.  Defendants Sedor and Brown owed a duty to plaintiffs to exercise that degree of care customarily exercised by attorneys at such closings, and to represent plaintiffs' interests in compliance with professional standards.

337.  Plaintiffs justifiably relied upon defendants Sedor and Brown to act in accordance with those duties and standards.

338.  At all times material hereto, defendants Sedor and Brown were engaged in the business of acting as an attorney at law while acting as real estate closing agent for the buyer, seller and lender, and as an agent of defendants Penn State and Old Republic.

339.  Defendants Sedor and Brown,  attorneys at law, were at all times doing business and acting as an attorney for the plaintiff/buyers, and were also acting as an escrow agent for the plaintiff/buyers, seller defendants, lender defendants, defendant Penn State and defendant Old Republic, and acting as plaintiffs' agent in the business of obtaining title insurance and title information for the Barwood Estate home closings.

340.  Defendants Sedor and Brown agreed to follow specific loan closing instructions in

connection with the sales of at Barwood Estates. These instructions outlined the special provisions applicable to FHA loans and prohibited disbursal of any funds if the settlement agent had actual knowledge that the HUD or FHA regulations were not being followed.

341.    The agreement to follow the closing instructions inured to plaintiffs' benefit. In effect, defendant Sedor and Brown's duties to comply with the written closing instructions also extended to the plaintiff buyers, as fiduciary and attorney therefor.

342.    Defendants Sedor and Brown failed to follow the written closing instructions, as required by contract with the lenders.

343.    Defendant Sedor and Brown breached their duties to plaintiffs by acting contrary to their interests and by failing to act in accordance with professional standards. They failed to disclose the existence of the conspiracy and scheme of which they were a part. They failed to disclose to plaintiffs that they were paying substantially more than their homes were worth, because the appraisals upon which they were relying were materially inflated and the product of collusion. They also failed to disclose that the gift monies reflected in the closing documents were, in actuality, derived from the Seller Defendants and/or falsely represented as coming from legitimate sources.

344.    Defendant Sedor intentionally failed to follow written closing instructions and/or acted fraudulently or dishonestly in handling and reconciling the loan funds, payments, disbursements and the HUD-1. He failed to act in his fiduciary capacity in handling the loan funds, payments, disbursements and the HUD-1.

345.    In the alternative, defendants Sedor and Brown acted recklessly or wantonly in handling the loan funds, payments, disbursements and the HUD-1.

346.    Defendants Sedor and Brown failed to comply with their fiduciary duties as escrow agent,

closing agent, fiduciary, and attorney, with regard to the collection and payment of funds

and reconciliation of these funds to the HUD-1, and in not providing notice to the

plaintiffs about the fraud they knew or should have known about concerning these

payments, disbursements, and the HUD-1.

347.    Defendant Sedor conspired with co-defendants to obtain commissions, earnings and/or

profits associated with the sale of homes to plaintiffs for amounts of money far above

these home's market value.

348.    In the alternative, defendants Sedor and Brown acted with recklessness, wantonness,

fraud or dishonesty in handling these funds, while acting as an attorney, and while

representing these plaintiffs/buyers.

349.    Plaintiffs attach to their complaint as Exhibit "A", a "Certificate of Merit" from Frank

Tobolosky, Esquire, which indicates that there is a reasonable probability that the care,

skill, or knowledge exercised or exhibited in Sedor's practice of law or law work which is

the subject of this Complaint, fell outside acceptable professional standards and that such

conduct is a cause in bringing about the plaintiffs' harm, or it indicates that Sedor

deviated from an acceptable professional standard.  This certificate is in the possession of

plaintiffs' counsel.

350.    As a proximate result of defendant Sedor and Brown's conduct, plaintiffs have been

economically harmed to their detriment and are entitled to damages in an amount to be

shown according to proof, as well as other relief set forth below.

## COUNT XXIII

## BREACH OF FIDUCIARY DUTY
### Plaintiffs vs. Sedor, Penn State and Old Republic

351.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

352.    Through representations, communications, documents, letters, and letterheads, defendant

Sedor indicated that he was affiliated, connected, or associated with defendants Penn

State and Old Republic.

353.    Defendants Old Republic and Penn State knew that defendant Sedor was an attorney,

acting as closing agent, escrow agent, and fiduciary to the plaintiff buyers, and was at the

same time representing Penn State, Old Republic, the Seller Defendants and the Lender

Defendants at the closing.

354.    Defendant Sedor was not only an attorney, but also was an express agent, apparent agent,

ostensible agent or an agent by estoppel of defendants Old Republic and Penn State.

355.    In the alternative, defendant Sedor's acts were subsequently ratified by defendants Penn

State and Old Republic, either expressly or by accepting and retaining the benefits of

defendant Sedor's acts.

356.    Defendant Sedor agreed to follow specific loan closing instructions in connection with

the sales of properties at Barwood Estates.  These instructions outlined the special

provisions applicable to FHA loans and prohibited disbursal of any funds if the settlement

agent had actual knowledge that the HUD or FHA regulations were not being met.

357.    The agreement to follow the closing instructions inured to plaintiffs' benefit.  In effect,

defendant Sedor's duty to comply with these written closing instructions also extended to

the plaintiff buyers, as fiduciary and attorney for the plaintiff buyers.

358.    Defendant Sedor intentionally failed to follow written closing instructions and/or acted

fraudulently or dishonestly in handling and reconciling the loan funds, payments,

disbursements and the HUD-1. He failed to act in his fiduciary capacity in handling the

loan funds, payments, disbursements and the HUD-1.

359.    In the alternative, defendant Sedor acted recklessly or wantonly in handling the loan

funds, payments, disbursements and the HUD-1.

360.    Defendant Sedor, acting as agent for defendants Old Republic and Penn State, failed to

comply with his fiduciary duties as escrow agent, closing agent, fiduciary, and attorney,

with regard to the collection and payment of funds and reconciliation of these funds to the

HUD-1, and in not providing notice to the plaintiffs about his knowledge of fraud

concerning these payments, disbursements, and the HUD-1.

361.    Defendant Sedor acted with recklessness, wantonness, fraud and/or dishonesty in

handling these funds in connection with the closings, while acting as an attorney and

while representing these plaintiffs/buyers.

362.    Defendant Sedor failed to follow the written closing instructions as required by contract

with the lenders.

363.    Defendant Sedor, while acting as agent for defendants Old Republic and Penn State,

conspired with co-defendants to obtain commissions, earnings or profits associated with

the sale of homes to plaintiffs for amounts of money far above these home's market

value.

364.    In furtherance of the conspiracy, defendant Sedor intentionally failed to exercise duties,

which omissions were affirmative acts taken to defraud HUD or FHA, and performed

affirmative acts to commit wire and mail fraud. Sedor also performed affirmative acts to

defraud or deceive the plaintiffs, so the plaintiffs would purchase homes for an amount of

money far above market value, thereby garnering greater commissions, earnings, and

profits for defendants.

365.    As a proximate result of defendant Sedor's breach of his duties, plaintiffs have been

economically harmed to their detriment and are entitled to damages in an amount to be

shown according to proof, as well as other relief set forth below.

COUNT XXIV<br>APPRAISAL NEGLIGENCE<br>Plaintiffs vs. Meagher and Associates,<br>Meagher & Krynock

366.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if alleged in full herein.

367.    Directly or through other agents, these Appraiser Defendants were retained by co-

defendants to appraise the homes that the plaintiffs were looking to purchase and to

provide an appraisal report that was accurate and within the standards of an appraisal

customarily established by industry standards and practices.

368.    The Appraisal Defendants owed a duty to plaintiffs to exercise that degree of care

customarily exercised by appraisers in order to ensure that the appraisal reports that they

were retained to provide were accurate and in compliance with industry standards and

practices.

369.    Plaintiffs justifiably relied upon these Appraisal Defendants to perform the appraisal

work in accordance with their professional appraisal standards.

370.    The appraisal reports created by these Appraisal Defendants directly or through their
agents were not accurate, were inflated, and materially failed to fairly and reasonably
reflect the true value of the properties at the time that the appraisals were performed.

371.    The appraisal reports prepared, generated and disseminated by these Appraisal
Defendants were unreasonably inaccurate in that the appraisal values for the Barwood
Estate homes significantly and materially exceeded their market value at the time of the
appraisal.

372.    The work performed by these Appraisal Defendants was not done in accordance with
industry standards or practices, reflected a careless and wanton disregard for the duties
owed by these Appraisal Defendants to the plaintiffs and, accordingly, constituted a
breach of those duties.

373.    As a proximate result of these Appraisal Defendant's breach, plaintiffs have been
economically harmed to their detriment and are entitled to damages in an amount to be
shown according to proof, as well as other relief set forth below.

**COUNT XXV**
**NEGLIGENCE**
**Plaintiffs vs. Lender Defendants**
**First Horizon Home Loan d/b/a MNC Mortgage**

374.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding
paragraphs as if alleged in full herein.

375.    The acts and practices of the Lender Defendants alleged herein resulted in the sale of
homes to the plaintiffs at artificially and fraudulently inflated prices, pursuant to a

scheme that involved, *inter alia*; inflated appraisals; false representations to plaintiff and/or federal agencies as to the plaintiffs' financial status; false representations as to the source of plaintiffs' monies used at the closings; false representations to plaintiffs as to the source of funds used for their home purchases; and false representations as to the actual or fair market appraised value of the property.

376.    This claim for relief arises under negligence and plaintiffs assert their claims against the Lender Defendants for their negligent acts, and as a proximate result, plaintiffs have been economically harmed to their detriment and are entitled to damages in an amount to be shown according to proof, as well as other relief set forth below.

**COUNT XXVI**
**VICARIOUS LIABILITY/RESPONDEAT SUPERIOR**
**Plaintiffs vs. First Horizon, Penn State,**
**Old Republic, Meager and Associates**

377.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if alleged in full herein.

378.    Defendants were principals and enlisted co-defendants Sweitzer, Hoch, Fierro, Hudson, Baxter Wolf, and Sedor to act as defendants' agent, to perform services for defendants and to act on defendants' behalf, subject to defendants' control.

379.    These agents performed their acts in the course and scope of their employment with actual or apparent authority from these defendant principals.

380.    These principals granted express authority for these agents to perform these acts described hereinabove, which acts were within the scope of these agents' employment.

381.    The agents' actions were performed on behalf of the principals and were part of the

proper, usual, and necessary exercise of the authority granted by the principals to the agents and were part of the scope of the agents' employment.

382. These principal defendants' words or conduct led plaintiffs to reasonably believe that these principal defendants had granted these agents the authority to perform the acts discussed hereinabove.

383. In the alternative, these principal defendants placed the agent into, or knowingly permitted the agent to occupy a position in which, according to ordinary experience and habits, it is usual for said agent to have authority of a particular kind, *i.e.*, apparent authority.

384. It was reasonable for plaintiffs to believe, because of the actions of the principal, that these agents had apparent authority to perform their particular acts.

385. These principals knew or should have known that these agents were exercising powers not granted to them and these principals failed to take reasonable steps to notify plaintiffs of the agents' limitations of authority.

386. Because of the actions of these agents, the plaintiffs justifiably changed their position and purchased the Barwood Estates homes with the reasonable belief that the agents' actions were authorized by the principal.

387. In the alternative, these agents' actions or acts, as discussed throughout the complaint, were subsequently ratified by the principal defendants, either expressly or by accepting and retaining the benefits of these agents acts, omissions, or actions.

388. The principals maintained, and continued to maintain throughout the time period set forth in this complaint, a control over the agent concerning the agent's relationship with the

plaintiffs.

389.   All acts of these agents were committed during their course of their employment and

within the scope of their employment with the principal defendants.  These principal

defendants were the employer of the agents in that they:

a)      controlled the manner of the agent's work;

b)      took responsibility for their results;

c)      accepted the terms of the agreement between the agent and the plaintiffs;

d)      controlled the nature of the agent's work;

e)      supplied the documents, forms, and other materials for the agents to perform their

job;

f)      controlled the method of payment of the agent;

g)      had the agent perform business which was the regular business of the employer;

h)      had the right to terminate the agent at any time; and/or

i)      took other actions which evidence that they acted as principal.

390.   Because of the nature of the relationship between these defendant principals and their

agents, and as a proximate result of the defendant principal agents' breech of their duties

owed to these plaintiffs, such plaintiffs have been economically harmed to their detriment

and are entitled to damages in an amount to be shown according to proof, as well as other

relief set forth below .

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on all Counts as follows:

a)     Awarding compensatory damages in favor of Plaintiffs against all Defendants,

       jointly and severally, for all damages sustained as a result of Defendants'

       wrongdoing, in an amount to be proved at trial, including interest thereon;

b)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

       including attorneys' fees, and expert fees, and costs;

c)     Awarding Plaintiffs treble damages as authorized by the respective statutes under

       which claims are brought, including claims under UTPCPL, 73 P.S. § 201-9.2(a);

d)     Awarding Plaintiffs punitive damages as authorized under the common law

       conspiracy and fraud claims;

e)     Awarding Plaintiffs treble and  punitive damages as authorized under RICO, 18

       U.S.C. § 1964 ( c ); and

f)     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 30, 2006

Mark Cuker, Esquire
Sherri L. Eyer, Esquire
*Williams Cuker Berezofsky*
One Penn Center Plaza at Suburban Station,
Ste. 800
1617 JFK Boulevard
Philadelphia, PA 19103
(215) 557-0099

David  M. Cedar, Esquire
Samuel Merovitz, Esquire

*Merovitz & Cedar, L.L.P.*
1234 Market Street, Suite 2040
Philadelphia, Pa. 19107

Seth Lesser, Esquire
110 East 55th Street, 12th floor
New York, NY 10022

David Banks, Esquire
3038 Church Road
Lafayette Hill, Pa. 19444

Stefanie Ebert, Esquire
*Locks Law Firm*
1500 Walnut Street, 20th Floor
Philadelphia, Pa. 19102

*Attorneys for Plaintiffs*